**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| SECURENET SOLUTIONS GROUP, LLC,<br>*Plaintiff*,<br>v.<br>AXIS COMMUNICATIONS AB,<br>*Defendant*. | Case No. 2:26-cv-00099-JRG<br>The Honorable J. Rodney Gilstrap |

**DEFENDANT AXIS COMMUNICATIONS AB'S**
**MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. The Asserted Patents .......... 2

1. Correlating Information .......... 5

2. Weighting Information .......... 5

3. Storing Information Where Desired .......... 6

B. Prior Litigation History .......... 7

III. LEGAL STANDARD .......... 9

IV. ARGUMENT .......... 9

A. The Eligibility Issue is Ripe for Adjudication .......... 9

B. ’616 Patent Claim 48 is Representative of All Asserted Patent Claims .......... 11

C. *Alice* Step 1: The Asserted Patent Claims are Directed to an Abstract Idea .......... 17

D. *Alice* Step 2: The Asserted Patent Claims Contain No Inventive Concept .......... 22

1. The Asserted Patents Confirm All Recited Technology Was Well-Known and Conventional .......... 23

2. The Specification Examples Cannot Provide an Inventive Concept .......... 26

3. The Claim Features Upon Which SecureNet Has Relied Do Not Contain an Inventive Concept .......... 27

4. The *Senstar* Court Relied in Error on the Abstract Idea at Step Two .......... 29

V. CONCLUSION .......... 30

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018)........................................................................ 9

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016)........................................................................ 22

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)........................................................................ 9

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014)........................................................................ 9, 15, 16

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
967 F.3d 1285 (Fed. Cir. 2020)........................................................................ 29

*Ancora Techs., Inc. v. HTC America, Inc.*,
908 F.3d 1343 (Fed. Cir. 2018)........................................................................ 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................ 9

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
915 F.3d 743 (Fed. Cir. 2019)........................................................................ 11

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)........................................................................ 23, 30

*CardioNet, LLC v. InfoBionic, Inc.*,
No. 20-2123, 2021 WL 5024388 (Fed. Cir. Oct. 29, 2021)........................................ 23

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019)........................................................................ 26

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)........................................................................ 11, 16

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011)........................................................................ 17

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012)........................................................................ 26

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)........................................................................ 19, 20

*Etison LLC d/b/a ClickFunnels v. HighLevel, Inc.*,
No. 25-1711, 2026 WL 1906579 (Fed. Cir. July 2, 2026)............................................. 10

*Fair Warning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)........................................................................... 19, 21

*First-Class Monitoring, LLC v. Ups of Am., Inc.*,
389 F. Supp. 3d 456 (E.D. Tex. 2019)....................................................................... 30

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026) ........................................................................... 25, 27

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ........................................................... 21, 23, 25, 26

*In re Killian*,
45 F.4th 1373 (Fed. Cir. 2022) ................................................................................. 21

*In re TLI Commc'ns LLC Pat. Litig.*,
823 F.3d 607 (Fed. Cir. 2016)............................................................................. 19, 20

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016)........................................................................... 21, 25

*Linquet Techs., Inc. v. Tile, Inc.*,
No. 20-cv-5153, 2022 WL 2812185 (N.D. Cal. July 18, 2022) ..................................... 11

*Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*,
No. 22-CV-2247-JAR-ADM, 2023 WL 3055323 (D. Kan. Apr. 24, 2013).................... 10

*Mentone Solutions LLC v. Digi Int'l Inc.*,
No. 21-1202, 2021 WL 5291802 (Fed. Cir. Nov. 15, 2021) .......................................... 22

*Miller Mendel, Inc. v. City of Anna, Tex.*,
107 F.4th 1345 (Fed. Cir. 2024) ................................................................................ 21

*Multimedia Plus, Inc. v. Playerlync, LLC*,
198 F. Supp. 3d 264 (S.D.N.Y. 2016), *aff'd*, 695 F. App'x 577 (Fed. Cir. 2017)........... 10

*MyMail, Ltd. v. ooVoo, LLC*,
No. 2020-1825, 2021 WL 3671364 (Fed. Cir. Aug. 19, 2021) ...................................... 23

*Optis Cellular Tech., LLC v. Apple Inc.*,
139 F.4th 1363 (Fed. Cir. 2025) ................................................................................ 26

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ................................................................................... 18

*Random Chat, LLC v. Altra Fed. Credit Union*,
No. 25-cv-478-JRG, 2026 WL 636677 (E.D. Tex. Mar. 6, 2026)............................. 21, 23

*Repifi Vendor Logistics v. IntelliCentrics, Inc.*,
No. 21-1906, 2022 WL 794981 (Fed. Cir. Mar. 15, 2022)....................................... 24, 25

*SecureNet Sols. Grp., LLC v. Arrow Elecs., Inc.*,
No. 22-cv-01254-KLM, 2023 WL 3821214 (D. Colo. June 5, 2023) ....................... passim

*SecureNet Sols. Grp., LLC v. Senstar Corp.*,
No. 19-cv-02913-NRN, 2020 WL 2557625 (D. Colo. May 20, 2020)...................... passim

*Simio, LLC v. FlexSim Software Prods., Inc.*,
983 F.3d 1353 (Fed. Cir. 2020)........................................................................................ 11

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014).................................................................................. 23, 24, 26

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
916 F.3d 1363 (Fed. Cir. 2019)........................................................................................ 19, 29

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ........................................................................................ 23

*Yu v. Apple Inc.*,
1 F.4th 1040 (Fed. Cir. 2021) .......................................................................................... 10

**Statutes**

35 U.S.C. § 101 ........................................................................................................ 1, 12, 14

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................. 1

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Axis Communications AB ("Axis") hereby moves to dismiss with prejudice Plaintiff SecureNet Solutions Group LLC's ("SecureNet") Second Amended Complaint (Dkt. 11, "SAC") in its entirety.

## I. INTRODUCTION

SecureNet's SAC asserts nine Asserted Patents[1] against Axis's video surveillance equipment, that are each invalid for failing to claim patent-eligible subject matter under 35 U.S.C. § 101. The Asserted Patents share near identical[2] specifications and, at bottom, claim nothing more than the abstract idea of correlating observable information about related events, weighting the information source based on subjective importance, storing the information where desired, and providing an output (*e.g.*, a generic alert). These basic steps of collecting, storing, and analyzing information invoke basic human activities that any security guard or detective would conduct as part of his or her routine duties, long before the advent of computer technology. The Asserted Patents themselves confirm that these basic activities can be carried out using any well-known and conventional components, and neither require nor result in any new or improved technology. Indeed, each patent expressly states that the claimed subject matter is "***not limited to the particular hardware*** shown or described," and "may be implemented ***using any hardware architecture***." '616 patent, 35:19-22, 36:1-4.[3]

---

[1] The "Asserted Patents" are, collectively, U.S. Patent Nos. 8,730,040 (the "'040 patent"), 9,344,616 (the "'616 patent"), 9,619,984 (the "'984 patent"), 10,020,987 (the "'987 patent"), 10,587,460 (the "'460 patent"), 10,862,744 (the "'744 patent"), 11,323,314 (the "'314 patent"), 11,929,870 (the "'870 patent"), and 12,375,342 (the "'342 patent"). The SAC does not include the Asserted Patents as exhibits, so copies have been filed with this Motion as Exhibits 1-9, for convenience.

[2] SecureNet acknowledges in the SAC that "[a]ll Asserted Patents are related and have the same Specification," and only cites to the '616 patent when purporting to describe all nine patents. SAC, ¶23 n.8. Axis likewise cites to the '616 patent specification herein, but the same disclosures can be found in the specifications of all Asserted Patents.

[3] All emphasis herein added unless otherwise stated.

In a prior SecureNet lawsuit filed against Senstar Corp. in the District of Colorado, the court found the ’040 patent (and four other related patents)[4] to be directed to the abstract idea of “(1) collecting data from sensors, (2) storing the data in storage devices, (3) analyzing the data, and (4) providing an output—or an ‘alert’ to be acted upon.” *See infra*, Sec. II.B. The remaining Asserted Patents—which were not at issue in that case—share the same specification and nearly identical claims (as SecureNet effectively concedes in the SAC). While the *Senstar* court ultimately deferred ruling on *Alice* step two based on the record before it (while noting that the evidence suggested that defendant Senstar “ha[d] the better side of the argument”), it did so based on SecureNet’s improper conflation of the abstract idea itself with purported “technology” that the patents admit is generic and conventional. *See id.* Here, the Court should similarly find the claims of the Asserted Patents to be directed to an abstract idea, and should not defer its *Alice* step two ruling. The SAC and Asserted Patents themselves readily demonstrate that the Asserted Patents claim nothing more than basic human activities carried out using well-understood, routine and conventional technology, arranged and operating in a conventional manner. No discovery or claim construction is necessary or required to resolve the eligibility question at this stage.

## II. BACKGROUND

### A. The Asserted Patents

The SAC currently asserts 14 claims from the nine Asserted Patents.[5] The patents’ common specification describes ideas in the field of video surveillance for analyzing data gathered from “sources” (*e.g.*, cameras) to detect and correlate events (*e.g.*, recognizing the same person in the

---

[4] The other patents included the ’837, ’098 and ’926 patents that SecureNet asserted in its original Complaint in this lawsuit. *See* Dkt. 1.

[5] ’040 patent claim 27, ’616 patent claim 48, ’984 patent claims 10 and 22, ’987 patent claim 20, ’460 patent claims 11, 13 and 14, ’744 patent claims 16 and 26, ’314 patent claims 13 and 21, ’870 patent claim 1, and ’342 patent claim 17 (collectively, the “Asserted Claims”).

same area on different days), and then take some generic action (*e.g.*, issue an alert). *See, e.g.*, '616 patent, 1:30-37, 3:52-58. While the claimed subject matter invokes the use of generic computer elements as tools, there is no new or improved technology required to carry it out. This is confirmed by the common specification, which describes no new surveillance technology and no new arrangements. To the contrary, the specification makes clear that the claimed ideas will work with ***any*** off-the-shelf components, arranged in ***any*** manner:

| Component | Specification Description | Cite |
|---|---|---|
| Processor, Memory, Other Hardware and architecture | "The present invention may be implemented using ***any hardware architecture***."<br>"[T]he present invention is ***not limited*** to the particular hardware shown or described here." | '616 patent, 35:19-22, 36:1-4 |
| Database | "[T]he present invention is ***not limited*** to the particular database designs shown and described here." | '616 patent, 18:55-58 |
| Legacy Systems | Pre-existing external systems, where "[t]he present invention may be implemented using ***any*** number of ... legacy systems." | '616 patent, 39:43-60; 40:48-50 |
| Camera, Sensor | "***Any*** camera device is within the scope of the present invention, as long as the camera device can capture video."<br>"[V]arious other sensory devices are within the scope of the present invention." | '616 patent, 7:35-41, 39:23-26 |
| Data Storage | "The storage hierarchy may include hard disk, optical disk, magnetic disk, flash memory, tape memory, RAID array, NAS (Network Attached Storage), SAN (Storage Area Network), or ***any other physical or virtual storage media***." | '616 patent, 11:38-41 |
| Network | "A network interface 1105 provides connectivity to a network, such as an Ethernet network, a Local Area Network (LAN), a Wide Area Network (WAN), an IP network, the Internet, etc." | '616 patent, 35:26-29 |

Likewise, the Asserted Patents claim their basic surveillance ideas using terminology that invokes a computerized environment, but the common specification makes clear that the data and terminology is generic and conventional. For example, the specification describes using two general types of data within the system: "meta-data" and "attribute data." The concept of "meta-data" was well-known, and simply means non-specific "data about data," such as information about "primitive events" (events captured by sensors, *e.g.*, a person entering a room), "compound"

events (two or more primitive events, *e.g.*, a person entering a room with no detected badge), "correlated" events "across either space or time" (*e.g.*, the same car detected at the same location on different days), or even information "***added manually by a human reviewer***." *Id.*, 3:62-4:29. Likewise, "attribute data" simply refers to non-specific "data about devices or sources," such as the age of a camera, or the time since a sensor was last checked or maintained. *Id.*, 4:50-5:10. These basic and conventional kinds of information were not invented by the patents, and have long been available to security guards.

Likewise, "sensory data," as used in the Asserted Claims, is simply data collected from non-specific and conventional sensors such as video cameras, audio detectors, and the like. *Id.*, 5:49-6:2, 7:36-41, 39:19-42. This sensory data may be processed by generic "software running on a ***general purpose hardware device***" such as a "***general purpose PC***" to detect "primitive" events, such as "people entering a designated area" in a video. *Id.*, 4:4-11, 5:56-62, 23:1-3, 36:53-66, 38:3-39:18. The sensory data and events are stored on generic and conventional storage devices, including "***any** … **physical or virtual storage media***." *Id.*, 11:38-41; *see also id.*, 11:48-54, 12:4-5, 37:3-15. Data storage and retrieval is carried out using a generic "API interface [that] provides a standardized set of function calls." *Id.*, 13:45-47. The data can then be transmitted via any conventional "network, such as the Internet." *Id.*, 14:25-28, 35:26-29. "Alerts" are non-specific, and may be generic emails or other messages. *Id.*, 7:26-30, 39:60-40:21. Notably, the specification makes clear that no particular ordered combination of components is required, and instead the subject matter "may be implemented using ***any hardware architecture***." *Id.*, 35:19-22, 40:48-54.

Just as the information and components are generic and conventional, so too are the ways that data is analyzed and manipulated in the claims.

### 1. Correlating Information

All Asserted Claims recite the concept of "correlating" information about events across "time or space," a basic aspect of any surveillance operation. This concept is reflected in '616 patent claim 39 (from which claim 48 depends) as follows:

> evaluating one or more ***historical correlations*** by automatically ***analyzing said primitive sensory events, across at least one of time and space***, for one or more historical correlations among the historical normalized sensory events

Other claims recite a non-specific "correlation engine" (*e.g.*, '460 patent claim 1) or "correlation module" (*e.g.*, '314 patent claim 1) for carrying out this basic process. The specification confirms that this function merely describes comparing two events to determine if there is something of interest. For example, "primitive sensory events" are any non-specific event that is detected by a sensor, such as a person entering a room. '616 patent, 4:4-11. Correlating events across "time" or "space" simply describes the basic cognitive process of observation and looking for patterns of interest. For example, correlation includes observing "the same car (based on its license plate or vehicle properties) ... loitering in the same location across several days," or observing "the same person (based on his or her swipe card number) allowing tailgating behind him or her on more than one occasion." *Id.*, 4:42-49. The Asserted Claims recite no new technology or specific programming required to carry out this basic concept of correlation.

### 2. Weighting Information

Certain Asserted Claims require "weighting" event information based on sensor "attributes" (*e.g.*, how old a camera is, where it is located), another basic concept that was entirely conventional at the time. This concept can be found, for example, in '616 patent claim 48:

> wherein the primitive sensory events are ***weighted*** based at least on one or more attribute data of the one or more sensors used to capture the sensory data.

The claims do not require any particular technology or process to apply this "weighting"—only that it be done based on whatever subjective criteria is desired. Indeed, the patents recognize that a ***human*** (system administrator) may subjectively apply weighting to information based on personal preference, such as preferred camera resolution or whether a camera might be "easily tampered with" based on its location. '616 patent, 26:14-39. The "weighting" itself is just assignment of a number to reflect that preference, with no particular scheme for doing so provided in the claims. This generic concept of weighting an information source based on subjective importance was not invented by the patents, as demonstrated by the specification, which acknowledges that a security guard would be aware that images from a low-resolution camera are less reliable for detection than images from a high-resolution camera, or that cameras installed in a high-crime area are more useful. *Id.*, 26:25-39; *see also id.*, 25:18-36 (gunshot detectors more likely to detect a gunshot than a generic microphone), 25:37-26:13 (newer, recently maintained, high-resolution cameras more reliable), 26:40-45 (power, bandwidth, interference, weather, and camera type may impact reliability).

### 3. Storing Information Where Desired

Certain Asserted Claims also recite storing information using a "hierarchical storage manager," which can be found, for example, in '314 patent claim 1 (from which claim 13 depends):

> a ***hierarchical storage manager*** having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events

Once again, the claims do not require any particular technology, structure, or programming for this element, and instead merely require "access" to a "hierarchy of two or more data storage devices," and non-specific "manage[ment]" of information storage and "cascad[ing]" (*i.e.*, moving information from one place to another). This is confirmed by the specification, which explains that

hierarchical storage can be carried out using "any ... physical or virtual storage media." '616 patent, 11:41-42. Nor do the claims require or recite any particular new technology or arrangement of components to "cascade" or move stored data, instead permitting it to be done in any manner, based on any subjective criteria. For example, the specification explains data can be stored in different locations based on its subjective "importance" to the user, or how old it is. *Id.*, 11:3-10, 11:55-56. The specification provides some examples of how this might be carried out, but the claims are not limited to any particular method.

### B. Prior Litigation History

The eligibility of the Asserted Patents has been challenged in several prior and pending cases, and all nine Asserted Patents are currently the subject of another pending motion to dismiss.

*SecureNet Sols. Grp., LLC v. Siemens Industry, Inc.*, No. 1:26-cv-1149 (N.D. Ill.):

SecureNet asserted all nine Asserted Patents against Siemens, and Siemens moved to dismiss that complaint due to patent ineligibility (Dkt. 28). The motion has been fully briefed, and the court stayed all discovery pending a ruling on Siemens' motion, which the court indicated may occur at the motion hearing scheduled for September 30, 2026 (Dkt. 19).

*SecureNet Sols. Grp., LLC v. Milestone Systems Inc.*, No. 3:25-cv-1232 (D. Or.):[6]

SecureNet asserted four Asserted Patents (along with five other related patents) against Milestone, and Milestone moved to dismiss that complaint on account of patent ineligibility (Dkt. 15). After Magistrate Judge Potter held a hearing on that motion and indicated her findings and recommendations would issue "shortly," SecureNet voluntarily dismissed that action, avoiding the ruling (Dkt. 50).

*SecureNet Sols. Grp., LLC v. The United States*, No. 1:26-cv-321 (Fed. Cl.):

[6] Milestone and Axis are independent companies, and both part of the Canon Group. Axis's national counsel here was also Milestone's national counsel in the District of Oregon case.

SecureNet asserted five of the nine Asserted Patents against the United States in the Court of Federal Claims, and the United States moved to dismiss that complaint due to patent ineligibility (Dkt. 7). The court stayed briefing on the motion due to perceived disputes over claim scope, including in view of the United States' willingness to conduct claim construction prior to revisiting eligibility (Dkt. 13).

Colorado Actions: As discussed above, SecureNet previously asserted patents from this family (including the asserted '040, '616, '744 and '314 patents) in two District of Colorado actions in which Rule 12 motions challenging patent eligibility were filed. In both cases, SecureNet attempted to rely on expert declarations filed as exhibits to the Complaints to defeat the motions.

In the first lawsuit against Senstar, the court declined to consider SecureNet's expert declaration, and determined that the claims across all five asserted patents "are substantially similar and are linked to the same general idea" of "(1) collecting data from sensors, (2) storing the data in storage devices, (3) analyzing the data, and (4) providing an output—or an 'alert' to be acted upon," which is abstract at *Alice* step one. *SecureNet Sols. Grp., LLC v. Senstar Corp.*, No. 19-cv-02913-NRN, 2020 WL 2557625, at *7-11 (D. Colo. May 20, 2020). At *Alice* step two, the court did ***not*** find that the claims contained an inventive concept. *See id.* at *11-12. In fact, the court indicated the ***opposite*** by observing that Senstar may "ha[ve] the better side of the argument." *Id.* at *12. However, the court found, based on the arguments and limited record presented in that case, there were potential questions of fact concerning "whether the hierarchy of storage devices, attribute data, weighing, and correlation constitute the necessary inventive concepts," and therefore deferred ruling on *Alice* step two at the pleading stage. *Id.* at *35-38.

In the second lawsuit against Arrow Electronics, the court agreed with the *Senstar* court that SecureNet's "[expert] declarations should be disregarded in full," even though they were filed

with the Complaint. *SecureNet Sols. Grp., LLC v. Arrow Elecs., Inc.*, No. 22-cv-01254-KLM, 2023 WL 3821214, at *9-10 (D. Colo. June 5, 2023). On the merits, the court treated the claims as abstract at *Alice* step one because "[SecureNet did] not contest the relationship between the Related Patents in *Senstar* and the Asserted Patents in th[at] case." *Id.* at *8. The court ultimately denied Arrow's motion at *Alice* step two, this time because Arrow had "relie[d] solely on" SecureNet's declarations in its opening brief, failed to "argue that ... there are no factual issues in the present case so as to allow for entry of judgment on the pleadings," and did not "argue that the *Senstar* court was incorrect in holding that factual issues barred dismissal." *Id.* at *9-11.

## III. LEGAL STANDARD

"A complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* In determining whether claims are eligible, a court must first determine "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014). If so, the court must evaluate whether there is an "inventive concept" to ensure that the claims amount to significantly more than a patent upon the ineligible concept itself. *Id.* Any limitations or other additional features "must be more than 'well-understood, routine, conventional activity.'" *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016).

## IV. ARGUMENT

### A. The Eligibility Issue is Ripe for Adjudication

Eligibility can be decided on a motion to dismiss where, like here, "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

There are no material factual disputes preventing resolution of this motion. The patents themselves concede that all claim-recited components are generic and conventional and require no particular architecture, and there are no legitimate claim construction disputes that could impact the determination. *Supra* at Sec. II.A; *Multimedia Plus, Inc. v. Playerlync, LLC*, 198 F. Supp. 3d 264, 267 (S.D.N.Y. 2016), *aff'd*, 695 F. App'x 577 (Fed. Cir. 2017) ("Where the claims of the patent are straightforward and no components are opaque such that claim construction would be necessary to flush out its contours, claim construction is not necessary"). Likewise, SecureNet's conclusory allegations of eligibility in the SAC are "not entitled to any weight in assessing the motion to dismiss." *Etison LLC d/b/a ClickFunnels v. HighLevel, Inc.*, No. 25-1711, 2026 WL 1906579, at *6 (Fed. Cir. July 2, 2026) (citation omitted).

The Helfers declaration filed with the SAC (Dkt. 11-1) also cannot manufacture a fact dispute. Expert opinions are not "facts" to be taken as true at the pleading stage, as the *Senstar* and *Arrow* courts recognized when declining to entertain similar declarations, whether attached as exhibits to motion papers (*Senstar*) or to the complaint (*Arrow*). *See Senstar*, 2020 WL 2557625, at *7; *Arrow*, 2023 WL 3821214, at *10 ("the Court finds that the declarations should be disregarded in full, for purposes of adjudicating the present Motion") (citing *Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*, No. 22-cv-2247, 2023 WL 3055323, at *3-4 (D. Kan. Apr. 24, 2013)). This Court should do the same, as "eligibility can be determined at the Rule 12(b)(6) stage without the aid of expert testimony." *Yu v. Apple Inc.*, 1 F.4th 1040, 1046 (Fed. Cir. 2021) (citation omitted). Furthermore, Dr. Helfers' background is in "criminology" and he has no technical knowledge relevant to the Asserted Patents, and thus cannot opine from the perspective of a POSITA. His opinions relate only to what he personally believes a security guard might or might not do, and he fails to include even a single cite to any Asserted Patent, rendering his

opinions completely untethered to the subject matter at bar.[7] *See Linquet Techs., Inc. v. Tile, Inc.*, No. 20-cv-5153, 2022 WL 2812185, at *2-3 (N.D. Cal. July 18, 2022) (declining to accept allegations in declaration attached to complaint that lacked citations to the plain language of the patent, even where the testimony was based on the declarant's own personal experience). Nor can his declaration be used to alter the express disclosure of the patents themselves. *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 755-56 (Fed. Cir. 2019) (plaintiff's expert declaration "made allegations inconsistent with the [asserted] patent, [and thus] the district court was not obliged to accept them as true"). Thus, his conclusory opinions on the legal issue of eligibility (from a layman's perspective) cannot preclude dismissal. *See Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020).

**B. '616 Patent Claim 48 is Representative of All Asserted Patent Claims**

Use of representative claims to analyze eligibility is appropriate where claims are "substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). Here, claim 48 of the '616 patent (the "Representative Claim") is representative of all Asserted Patent claims. Claim 48 depends from claim 39, which together recite:

> 39. A non-transitory, physical storage medium storing computer-readable program code … causing the hardware processor to execute steps comprising:
>
> [a] ***receiving sensory data*** about a physical environment from one or more sensors;
>
> [b] ***receiving IP data*** of the one or more sensors, wherein the IP data comprises at least an Internet Protocol (IP) address and a network status of at least one of the sensors;
>
> [c] ***processing the sensory data*** from the one or more sensors to detect one or more primitive sensory events;
>
> [d] ***normalizing the primitive sensory events*** into a standardized data format;

[7] The declaration was also executed prior to the SAC, and Dr. Helfers allegedly "considered" only 4 of the 9 Asserted Patents, and two others that are no longer asserted (*see* Dkt. 11-1 at 3 (¶7), 6).

> [e] ***storing the normalized sensory events*** in an event database for later retrieval;
>
> [f] ***retrieving one or more historical normalized sensory events*** from the event database;
>
> [g] ***evaluating one or more historical correlations by automatically analyzing said primitive sensory events***, across at least one of time and space, for one or more historical correlations among the historical normalized sensory events;
>
> [h] ***monitoring continuously and in real-time the primitive sensory events*** from the one or more sensors based on the one or more historical correlations to identify one or more critical events;
>
> [i] ***monitoring continuously and in real-time the network status*** of one or more of the sensors based on the IP data to identify one or more network failure events; and
>
> [j] ***sending one or more alerts*** based on at least one of said critical events and said network failure events.
>
> 48. The non-transitory, physical storage medium of claim 39, wherein the ***primitive sensory events are weighted*** based at least on one or more attribute data of the one or more sensors used to capture the sensory data.

All Asserted Claims recite nearly the same subject matter with immaterial and conventional variations for purposes of the § 101 analysis.

Like the Representative Claim, all Asserted Claims recite similar steps of manipulating data (*e.g.*, collecting, storing, processing, weighting, and correlating) to generate some output (*e.g.*, an alert). The data may be sensory data itself (*e.g.*, video data from conventional video cameras) or metadata (*e.g.*, how old the camera is, where it is located). Further, like the Representative Claim, certain Asserted Claims further recite an "event queue" and/or "event database" (generic locations where "events" are stored), and use of "legacy" or "historical" system data (other, already-existing external systems such as card access and personnel systems). *See* '616 patent, 6:21-28, 7:1-10, 18:45-50, 39:43-59. The Asserted Claims include no particular requirements concerning the manner, type, or structure of the event database/queue or legacy/historical data.

In addition, like the Representative Claim, other Asserted Claims further recite that data is "normalize[ed]." The specification describes normalization as merely converting data into any generic standard format so it can be compared to other data (*id.*, 6:50-7:3), yet the claims simply

recite this basic function without any requirements regarding the structure, design, or operation of the generic computer processor on which it is carried out. Likewise, the Representative Claim and other Asserted Claims require monitoring the "network status" of components based on sensor "IP data" to make sure they are awake and working. *See id.*, 5:31-48, 9:14-28. Monitoring information sources to see if they are "awake" or "asleep" is a long-standing practice of any security or surveillance operation, and the claims do not require any particular way to conduct the monitoring, much less any new or improved technology to carry it out. '616 patent, 9:64-10:3.

Other Asserted Claim limitations that do not appear verbatim in the Representative Claim are basic concepts that include: (1) system components communicating over a generic IP network ('314 patent claim 13), (2) the metadata (detected event) being a face, vehicle, license plate, object size, or object speed ('744 patent claim 16, 26; '314 patent claim 13, 21; '870 patent claim 1; '342 patent claim 1), and (3) data being stored in a "hierarchical storage manager" ('744 patent claim 26; '314 patent claim 13, 21). These differences in no way distinguish the remaining Asserted Claims from the Representative Claim for purposes of eligibility. For example, computer components communicating information about, *e.g.*, a person's face or license plate, over a pre-existing and conventional computer-based IP network is simply an application in a computer environment of tasks that security guards have done for generations—identifying a person of interest based on their face, and telling that information to someone else to take action.

With respect to "hierarchical storage," SecureNet has previously contended that this feature—which appears in Asserted Claims of only two of the nine Asserted Patents (the '744 and '314 patents)—should be addressed through '314 patent claim 13 in the representativeness analysis. However, that claim only demonstrates that this feature does not alter the eligibility analysis, as the recited "hierarchical storage manager" does not have any required structure or

programming, aside from non-specific "access" to "two or more data storage devices" that the specification confirms are conventional. *See* '616 patent, 11:38-47. As reflected in the claim, hierarchical storage simply refers to moving (or "cascading") stored data to a different conventional location based on subjective importance. *See also id.*, 11:3-10, 11:38-56. There is no requirement in the claims for any particular type or amount of data being stored, or any particular manner of moving or "cascading" data. As the *Senstar* court found, the use of a hierarchical storage manager does not prevent the Asserted Patents from being directed to an abstract idea. *See* 2020 WL 2557625, at *11. In any event, the hierarchical storage manager is addressed below, and can be considered together with the Representative Claim (for those patents to which it relates) as it does not serve to confer eligibility.

Just as claim 48 of the '616 patent is representative of the remaining Asserted Claims, each Asserted Claim is itself representative of all claims in their respective Asserted Patents, as the non-asserted claims recite the same subject matter with minor variations that do not impact the § 101 analysis. For example, the non-asserted claims: reflect the same idea in "system" vs. "method" claims (*e.g.*, '040 patent, claims 1, 43); require detection of multiple events vs. single events (*e.g.*, '040 patent, claim 57); collect various types of conventional attribute data such as the quality of the sensor (*e.g.*, '616 patent, claims 49-55); identify various types of conventional primitive sensory events such as the presence of an intruder (*e.g.*, '984 patent, claims 26-39); incorporate additional data such as "tips" received from conventional human sources (*e.g.*, '616 patent, claim 9); recite use of various types of conventional sensors, like a temperature probe, speedometer, or water meter (*e.g.*, '744 patent, claim 10); require weighting of events' relative importance to be based on conventional factors such as quality of the sensory data (*e.g.*, '314 patent, claim 7); and/or

use correlation thresholds to perform unspecified, conventional actions (*e.g.*, ’870 patent, claim 10).[8]

These additional concepts in the non-asserted claims are directed to the same abstract idea as the Representative Claim: correlating observable information about related events, weighting the information source based on subjective importance, storing the information where desired, and providing some output. The patents describe the additional recited hardware as including generic and conventional components (*supra* Sec. II.A), and do not disclose any specific manner or way that the recited conventional components would need to be altered or reprogrammed in order to carry out these concepts, beyond simply describing the idea of using conventional components to collect, store, and analyze data, and take action based on that analysis. The non-asserted claims therefore do not change the abstract nature of what is claimed and simply instruct to “apply” that abstract idea in a conventional technological environment. *See Alice*, 573 U.S. at 221.

Other courts that have considered subsets of the Asserted Patents similarly found that they were representative of one another. For example, the *Senstar* court found that the ’040 patent and four others sharing the same specification were “substantially similar and linked to the same general idea” of “using sensors to collect information, weighing the relative importance of the data from the sensors, storing the data in a hierarchical database, and issuing an alert based on an analysis of the data.” 2020 WL 2557625, at *7-8 (“I agree with the Defendant that in making the analysis of patent ineligibility under § 101, ***I need not address each claim of each patent separately***.”). In *Arrow*, because SecureNet failed to demonstrate a meaningful difference “between the Related [’837, ’098, and ’926] Patents in *Senstar* and the Asserted [’616 and ’314]

[8] For convenience, Axis cites examples from only one patent for each category. However, each category and cite is generally applicable to and representative of the additional limitations found in the non-asserted claims across all Asserted Patents.

Patents in this case" for purposes of eligibility, the court addressed all claims collectively. *See* 2023 WL 3821214, at *8.

SecureNet does not (and cannot) demonstrate any meaningful difference between the Asserted Patents in its SAC. To the contrary, SecureNet has ***relied*** on representativeness in its pleadings, including by treating the claims and subject matter indistinguishably for purposes characterizing the Asserted Patents and allegedly mapping features of the Asserted Claims to the accused products. For example, SecureNet cites solely to the '616 patent when purportedly describing the claimed subject matter. SAC, ¶ 23 n.8; *see also id.*, ¶¶ 24-59. SecureNet follows this with several pages of allegations concerning "Accused Products" that reference claim terms in an apparent attempt to demonstrate infringement, but without reference to any particular Asserted Patents. *Id.*, ¶¶ 71-181. In fact, SecureNet's prior amended complaint (Dkt. 6, "FAC") grouped similar limitations across all patents according to their generic recited function, thereby demonstrating not only that such limitations can be treated the same, but also that they are in fact directed to the abstract functionality in the section titles. *See* FAC, ¶¶ 79-88 ("B. Receiving, capturing, processing sensory data."), ¶¶ 89-98 ("C. Storing Sensor Data"), ¶¶ 99-117 ("D. Correlation of sensor data to identify critical events"), ¶¶ 118-126 ("E. Use of weighting to detect events"). While SecureNet has conspicuously omitted such grouping in its SAC (after seeing other motions point this out), its prior allegations serve to confirm the lack of any material differences.

Thus, each Asserted Claim is representative of all claims of their respective Asserted Patents, and claim 48 of the '616 patent is representative of all Asserted Patent claims. Any differences are insubstantial, as all claims are drawn to the same abstract idea and recite token post-solution elements performed by "purely conventional" computing elements, as demonstrated by the patents themselves. *Alice*, 573 U.S. at 225; *see also Content Extraction*, 776 F.3d at 1348

(finding claims representative and explaining that plaintiff should have "differentiated any claim from those identified as representative" if it believed otherwise).

### C. *Alice* Step 1: The Asserted Patent Claims are Directed to an Abstract Idea

All Asserted Patent claims are directed to the abstract idea of ***correlating observable information about related events, weighting the information source based on subjective importance, storing the information where desired, and providing an output***. Such subject matter is the classic abstract idea that can be performed in the human mind, or using pen and paper. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011). "[A]t a high level, the application of the Patents to the security context is similar to what security guards have always done." *Senstar*, 2020 WL 2557625, at *11.[9]

The abstract nature of the subject matter is confirmed by the common specification. For example, the specification describes an exemplary "stalker" scenario implementing the claimed subject matter, where "a car loiters" in the same area for two consecutive days and this activity is "detected, stored and indexed." '616 patent, 41:27-48. In this scenario, a human "security guard" later "queries the system for multiple instances of loitering," "identifies the vehicle," "writes down the license plate number" and confirms the stalker's identity. *Id.* After investigating whether there is an outstanding warrant, "[t]he security guard then creates a new rule to generate an alert" if the car reappears, and, once alerted, "the security guard dispatches the police." *Id.*

These steps describe basic security and surveillance activities, carried out with the assistance of generic computerized functions like querying a database and generating alerts as

---

[9] The *Senstar* court arrived at a similar conclusion, finding the claims of the '040 patent and four others (not asserted here) to be directed to the abstract idea of "(1) collecting data from sensors, (2) storing the data in storage devices, (3) analyzing the data, and (4) providing an output—or an 'alert' to be acted upon." 2020 WL 2557625, at *10. This recitation, based on the patents in that case, is the same as the abstract idea identified herein in all material respects.

desired. Indeed, the claimed subject matter "can be performed in the human mind" or "using a pencil and paper," without requiring any particular hardware components. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021); *see also Senstar*, 2020 WL 2557625, at *11 (analogizing the claims to an interaction between a haberdasher and a customer). For example:

| '616 Patent, Claim 48 | Human Security Guard |
|---|---|
| 39. A non-transitory, physical storage medium … comprising: | Security guard monitoring a security system at a premises. |
| [a] receiving sensory data about a physical environment from one or more sensors; | Security guard receives surveillance video footage from a video camera, and audio data from an audio detector. |
| [b] receiving IP data of the one or more sensors, wherein the IP data comprises at least an Internet Protocol (IP) address and a network status of at least one of the sensors; | Security guard receives a notification or sees a black screen if a video camera or audio detector is offline. |
| [c] processing the sensory data from the one or more sensors to detect one or more primitive sensory events; | Security guard analyzes surveillance video footage and audio data to detect motion or objects or other suspect activity. |
| [d] normalizing the primitive sensory events into a standardized data format; | Security guard commits video events (*e.g.*, "suspect X captured on the lobby camera") and audio events (*e.g.*, "voices heard in the storeroom") to pen-and-paper in a standardized data format, for example, the time, the place, the logger, and a description of the event. |
| [e] storing the normalized sensory events in an event database for later retrieval; | Security guard records the events in the logbook. |
| [f] retrieving one or more historical normalized sensory events from the event database; | A security guard working the night shift consults the logbook to see past entries, for example from the day shift. |
| [g] evaluating one or more historical correlations by automatically analyzing said primitive sensory events, across at least one of time and space, for one or more historical correlations among the historical normalized sensory events; | When a person is detected at night loitering in front of the office, the night-shift security guard sees that there is an entry in the logbook indicating that the same person was also seen in the lobby at a certain time earlier in the day. |
| [h] monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events; | Security guard continues to monitor the video camera and audio detector to identify if the person-of-interest is conducting routine activity or committing a crime. |
| [i] monitoring continuously and in real-time the network status of one or more of the | Security guard continues to monitor the video camera and audio detector to ensure they are still connected and active on the network. |

| ’616 Patent, Claim 48 | Human Security Guard |
|---|---|
| sensors based on the IP data to identify one or more network failure events; and | |
| [j] sending one or more alerts based on at least one of said critical events and said network failure events. | Security guard sounds an alarm upon observing the person-of-interest commit a theft. |
| 48. The non-transitory, physical storage medium of claim 39, wherein the primitive sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data. | Security guard accounts for the video resolution, angle of the surveillance video footage, clarity of the audio data, and records of past break-ins detected at a particular door, to help determine the likelihood that the person-of-interest is breaking and entering. |

The additional aspect of storing information where desired (*i.e.*, “hierarchical storage”) does not change this result, as human security guards routinely perform that function—*e.g.*, by moving older logbooks to a separate filing cabinet—and the claims do not require any particular methodology or new technology to carry it out. *See supra* Sec. II.A.3. That the computerized environment of the claims may carry out the concepts faster than a human is irrelevant, as “the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself.” *Fair Warning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016); *see also Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) (“While [the recited functions] may take longer using the manual method, a patent that automate[s] pen and paper methodologies to conserve human resources and minimize errors” is a “quintessential ‘do it on a computer’ patent” directed to an abstract idea.).

The Federal Circuit has consistently held that these basic steps of gathering, storing, analyzing, and communicating information—alone, or in combination—are abstract ideas. *See, e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (“gathering and analyzing information of a specified content, then displaying the results” is abstract); *In re TLI Commc’ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (classifying an image and storing it based on its classification is abstract). For example, *Electric Power* involved long and detailed

patent claims that recited "systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results." 830 F.3d at 1351. The representative claim was directed to collecting data from multiple disparate sources, analyzing that data in real time to "detect events" of interest, correlating results across data streams, and displaying a composite indicator of power grid vulnerability, without requiring any particular technological improvement in how those functions are performed. *Id.* at 1351-52. The Federal Circuit found the claims to be abstract, as "collecting information," "analyzing information," and "presenting the results" are all "within the realm of abstract ideas," and "the combination of those abstract-idea processes" is "an abstract idea" as well. *Id.* at 1353-54. In doing so, the Court reasoned that the claims did not provide "computer-functionality improvements," but instead, they used "existing computers as tools in aid of processes focused on abstract ideas." *Id.* (internal quotation omitted). Similarly, in *TLI Communications*, the Federal Circuit found that recording, classifying, storing, and transmitting images was an abstract idea, and the use of tangible components "merely provide a generic environment in which to carry out the abstract idea." 823 F.3d at 611.

The same is true here. Like the claims in *Electric Power* and *TLI Communications*, the Asserted Patent claims are abstract because they are not directed to any specific improvement to computer-functionality, and instead recite basic steps of receiving, processing, storing and analyzing data, and providing a generic "alert" output, while carrying out these functions using admittedly conventional components arranged and used in a conventional manner. *See supra* Sec. II.A. The claims may invoke generic technology when reciting the abstract idea, but as this Court recently reiterated, a claim that "merely takes [an abstract concept] in the real world and

implements it through existing ... technology" is directed to an abstract idea. *Random Chat, LLC v. Altra Fed. Credit Union*, No. 25-cv-478-JRG, 2026 WL 636677, at *3 (E.D. Tex. Mar. 6, 2026).

Correlating information is an abstract idea under governing precedents. *See In re Killian*, 45 F.4th 1373, 1379-80 (Fed. Cir. 2022) (claims directed to "the collection of information from various sources," "comprehending the meaning of that collected information, and indication of the results" were abstract); *FairWarning*, 839 F.3d at 1094-95 (invalidating claims directed to monitoring and reporting suspicious "events" by applying rules to detected access events). That the claims relate to the particular field of video surveillance does not change this result. *See Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir. 2023) (affirming ineligibility of claims directed to "storing and displaying video" in the field of video surveillance). Likewise, weighting an information source based on subjective considerations is no less abstract than applying human judgment. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313-16 (Fed. Cir. 2016) (invalidating claims for email filtering that considered the source (sender) to make routing decisions). Moving and storing information where desired is a basic human practice, and the claims reciting this feature require nothing more than carrying that concept out in a non-specified manner using conventional data storage, which is abstract. *See Miller Mendel, Inc. v. City of Anna, Tex.*, 107 F.4th 1345, 1352 (Fed. Cir. 2024) ("the claims are directed to receiving, storing, transmitting, determining, selecting, and generating information, which place them in the 'familiar class of claims directed to a patent-ineligible concept'").

The claims here are far different from the types of claims the Federal Circuit has found eligible, which typically recite specific means for improving computer technology itself, or solving specific computer problems. For example, in *Ancora Techs., Inc. v. HTC America, Inc.*, the Federal Circuit found claims for verifying computer software eligible, explaining that "[i]mproving

security ... can be a non-abstract computer-functionality improvement ... done by a specific technique that departs from earlier approaches to solve a specific computer problem." 908 F.3d 1343, 1348 (Fed. Cir. 2018). The court noted "[that] claimed method ... specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way." *Id.* Similarly, in *Mentone Solutions LLC v. Digi Int'l Inc.*, the Federal Circuit found claims directed to dynamic resource allocation eligible because they "add[ed] [a] capability" that did not previously exist, and "solve[d] a challenge unique to computer networks" by providing a detailed solution grounded in network technology itself. *See* No. 21-1202, 2021 WL 5291802, at *3-5 (Fed. Cir. Nov. 15, 2021).

By contrast, the Asserted Patent claims do not require any specific improvement to computer or network functionality, much less an unexpected way of effecting such an improvement. *Supra* Sec. II.A. The claims do not describe ***how*** sensory data is received, processed, normalized, stored, or evaluated, and do not focus on ***how*** performance of its steps could alter a traditional security system in a way that could lead to an improvement in the technology itself. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ("[T]he claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem. The purely functional nature of the Asserted Claims confirms that they are directed to an abstract idea, not to a concrete embodiment of that idea."). Nor do the claims require any particular design (improved or otherwise) for its recited components, and instead simply require using conventional components in their routine manner to achieve expected results. *Supra* Sec. II.A.

Accordingly, the Asserted Patent claims are directed to an abstract idea.

### D. *Alice* Step 2: The Asserted Patent Claims Contain No Inventive Concept

At step two, the claim "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715

(Fed. Cir. 2014) (quotation omitted). Here, the claims recite generic and conventional technology, and lack any meaningful limitations that could qualify as an inventive concept.

### 1. The Asserted Patents Confirm All Recited Technology Was Well-Known and Conventional

The abstract steps of correlating observable information about related events, weighting information sources based on subjective importance, storing information where desired, and providing an output, cannot themselves supply the inventive concept. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) (The "claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept"). These basic functions can be performed by any conventional components—the Asserted Patents admit that no new or specially-programmed hardware is needed. *Supra* Sec. II.A. "As the Federal Circuit has explained, if the representative claim(s), read in light of the specification 'can be implemented using generic computer elements,' then they 'do not show a technological improvement.'" *Random Chat*, 2026 WL 636677, at *4 (quoting *Hawk Tech.*, 60 F.4th at 1355); *see also CardioNet, LLC v. InfoBionic, Inc.*, No. 20-2123, 2021 WL 5024388, at *5-6 (Fed. Cir. Oct. 29, 2021) (no inventive concept where "components are conventional" and used to "perform[] basic functions").

The recited hardware components cannot plausibly provide an inventive concept because each component—a "storage medium," a "hardware processor," "sensors," a "database"—admittedly constitutes conventional hardware. *Supra* Sec. II.A. *See MyMail, Ltd. v. ooVoo, LLC*, No. 2020-1825, 2021 WL 3671364, at *7 (Fed. Cir. Aug. 19, 2021) (finding no inventive concept where "the individual claim elements are either generic computer components or routine activity," such as "a user Internet device," "a server" and "a toolbar"). Nor can the combination of multiple conventional components and functionality in the claims supply an inventive concept. *See Universal Secure Registry LLC v. Apple Inc.,* 10 F.4th 1342, 1355 (Fed. Cir. 2021) (finding the

claimed "combination of [] long-standing conventional methods of authentication yielded expected results of an additive increase in security," and nothing in the record suggested an additional technological improvement). At most, the claims "merely recite the use of conventional abilities of [] conventional" components, which cannot confer eligibility. *Repifi Vendor Logistics v. IntelliCentrics, Inc.*, No. 21-1906, 2022 WL 794981, at *3 (Fed. Cir. Mar. 15, 2022).

As illustrated in the Representative Claim, the Asserted Patents do nothing more than claim the abstract idea as implemented on a generic computing elements that are merely used to process the steps of the abstract idea itself, which is insufficient to find patent eligibility at step two. *See Alice*, 573 U.S. at 223. The claimed sequence of "receiving" sensory data, "processing" the data to obtain metadata therefrom, and "normalizing," "storing," "evaluating," and "monitoring" the data/metadata "comprises only 'conventional steps, specified at a high level of generality,' which is insufficient to supply an 'inventive concept.'" *Ultramercial*, 772 F.3d at 716. There is certainly nothing about the recited "data" that is inventive, as the specification again makes clear that data and metadata is non-specific, and simply the output of conventional components like existing video cameras, audio devices, and other sensors. *Supra* Sec. II.A.

Likewise, nothing in the "ordered combination" of components in the claims can supply an adequate inventive concept. The common specification makes that clear by acknowledging that "[t]he present invention is ***not limited*** to the particular hardware shown or described," and "may be implemented using ***any hardware architecture***." '616 patent, 35:19-22, 36:1-4. Indeed, each claimed component is arranged and used conventionally: the conventional sensors sense conditions and send data, the conventional processors process the sensory data, the conventional databases store the sensory data, and the conventional networks communicate the sensory data. *Supra* Sec. II.A. While the patents refer to perceived problems with prior art systems, such as managing large

amounts of data or lowering false alarm rates (*see* '616 patent, 11:3-41, 2:9-13), nothing ***in the claims*** requires "large amounts of data," or otherwise provides an actual technological solution to these issues that changes the conventional nature of the recited components and their arrangement.

Rather than improving the technical functioning of conventional data storage systems or requiring specific technology improvements to diminish of "false alarms," the claims merely recite use of conventional components in an intended manner, to carry out common security activities using broad functional language, which is not sufficient to confer eligibility. *See GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1067-68 (Fed. Cir. 2026) (reiterating that "it is not sufficient, in order to pass muster, for a claim to use functional, result-focused language or to encompass ordinary computers and networks to perform their ordinary functions ... without going further to require a specific implementation to improve *how* those functions are carried out"); *Intellectual Ventures*, 838 F.3d at 1316 (contrasting claims that "improved an existing technological process by describing 'how [a] particular arrangement of elements is a technical improvement over prior art ways of filtering [Internet] content'" with claims that lacked "any 'specific or limiting recitation of . . . improved computer technology' [and instead] describe only generic computer elements" (internal citations omitted)). While the claims may automate human activity through conventional computer technology, "automation of a long-standing human process cannot be the inventive concept because such automation is itself an abstract idea." *Repifi*, 2022 WL 794981, at *3.

In *Hawk Technology*, the Federal Circuit considered claims directed to similar video-surveillance technology, and found them ineligible despite reciting, *e.g.*, functional results of "receiving video images," "digitizing" images, "converting one or more of the video source images into a selected video format," and "storing" and "transmitting" video images. 60 F.4th at 1357. Like here, those claims "lack[ed] 'sufficient recitation of how the purported invention improve[s]

the functionality,'" and were "recited at such a level of result-oriented generality" that they amounted "to a mere implementation of an abstract idea.'" *Id.* at 1358.

Any other limitations that are not found expressly in the Representative Claim (*supra* Sec. IV.B) do not change the outcome. For example, that system components communicate over a conventional IP network is not an inventive concept. *Ultramercial*, 772 F.3d at 716 ("The claims' invocation of the Internet also adds no inventive concept."). Nor is limiting detected sensory data to a face, vehicle, license plate, object size, or object speed, as these limitations merely reflect the abstract idea of data collection itself, with reference to objects anyone can detect. *Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1380 n.11 (Fed. Cir. 2025) ("[T]he abstract idea cannot contribute to the inventive concept."). Nor does storing data in a hierarchical manner provide an inventive concept, as that merely describes the concept of moving information to preferred locations in a non-specific manner, without requiring any particular design or architecture to carry out that concept. *Supra* Sec. II.A.3.

**2. The Specification Examples Cannot Provide an Inventive Concept**

SecureNet's SAC cites to various embodiments in the specification to try to find eligibility in non-limiting examples of how the subject matter ***might*** be carried out, or where benefits ***might*** be seen (*e.g.*, using "numerous" sensors or large quantities of data). SAC, Secs. V-VI. However, "[i]n considering patent eligibility under § 101, ***one must focus on the claims***," as "a claim may 'preempt' only that which the claims encompass, not what is disclosed but left unclaimed." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012). While the specification may help illuminate what the claims are directed to, it "cannot be used to import details from the specification if those details are not claimed," and "any reliance on the specification in the § 101 analysis must always yield to the claim language." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019). SecureNet cannot escape the fact that its ***claims*** do not require any

particular hardware, architecture, or programming, or any particular number of sensors beyond "one or more sensors," or any particular amount of data. If SecureNet wanted to limit its claims to only specific examples or equations in the patents, it could have done so; it instead chose to broadly claim abstract concepts in a generic manner without reciting "how" the functional results are achieved, rendering the claims unpatentably abstract. *See GoTV*, 166 F.4th at 1067-68.

#### 3. The Claim Features Upon Which SecureNet Has Relied Do Not Contain an Inventive Concept

In prior cases, SecureNet argued that patents within this family contain inventive concepts that can be found in four features: hierarchical storage, weighting, attribute data, and correlating events. *See Senstar*, 2020 WL 2557625, at *12; *Arrow*, 2023 WL 3821214, at *9. The SAC similarly invokes these supposedly inventive concepts as well. *See* SAC, ¶¶ 60-70. However, these concepts cannot supply an inventive concept because they merely reflect the abstract idea itself, and the patents admit that no new or improved technology is required to carry them out, in direct contradiction to SecureNet's unsupported allegations. *Supra* Sec. II.A.1-3.

The "hierarchical storage manager" term appears in Asserted Claims of only two of the nine Asserted Patents (the '744 and '314 patents), and simply refers to the concept of migrating (or moving) stored data based on non-specific and subjective criteria, such as how old the data is or freeing up storage space—in other words, abstract concepts of manipulating data based on preference. *Supra* Sec. II.A.3; '616 patent, 11:3-10. While the specification describes possible ways this idea could be carried out (*e.g.*, based on subjective features or by calculating a weighted average using "Equation[s]"), the patent itself states these are only "sample[s]" that are "illustrative" of "numerous" other ways to carry out this feature. '616 patent, 11:38-12:43. The claims that require hierarchical storage, on their face, are not limited to any particular design or architecture at all (*e.g.*, '314 patent, claim 13). Furthermore, the common specification makes clear

that the hierarchical storage may be implemented using "***any* ... *physical or virtual storage media***," and an "API interface [that] provides a ***standardized set of function calls*** when storing data"—in other words, non-specific, well-known, and conventional storage mediums and interfaces, where any details in the specification are characterized as merely "illustrative." '616 patent, 11:3-10, 11:38-41, 13:36-47. The actual claim limitations reciting this feature merely requires "two or more data storage devices" that are "adapted to store data from the one or more sensors" and "adapted to manage storage and cascade of data through the hierarchy," without reciting any new or improved hardware or programming to carry out these basic, functional concepts. *Supra* Sec. II.A.3. The claim language critically fails to explain "how" the HSM must be designed or programmed to carry out the broad functional requirements (such as "cascading" data), and thus fails to provide any concrete solution to any problem identified in the patent, much less any actual improvement to existing technology. *See GoTV*, 166 F.4th at 1067-68.

Likewise, "weighting" based on "attribute data" cannot provide an inventive concept, as it is itself an abstract idea. *Supra* Secs. II.A.2, IV.C. *See also Senstar*, 2020 WL 2557625, at *10 ("Indeed, the weighing process described in the patents, while purporting to be automated via use of an algorithm, appears to be merely the subjective assignment of a weight number by a human assessor."). Examples of possible ways to weight in the patents cannot render this abstract concept concrete, as there is nothing ***in the claims*** that requires any particular manner or methodology for the "weighting," or even any restrictions on what the weighting should relate to, so long as it involves non-specific "attribute data" (which itself is just observable information about a source). In fact, according to the patents, the weighting can be applied ***by a human***, based on his or her subjective interests regarding sources of information, using any scale he or she chooses. *See* '616 patent, 26:14-39. A claim "must go beyond stating a functional result; it must identify 'how' that

functional result is achieved," and the claims here do not recite "how" weighting must be carried out. *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1302 (Fed. Cir. 2020).

So too with respect to the basic concept of "correlating" data—the patent claims contain no guidance or limitations concerning how the "correlation" must be carried out, and what new or improved technology must be used to do so. Instead, the claims at most correlate events "across at least one of time and space," which is no more than comparing two events that either took place at two different times, or two different locations, as any human can do. *Supra* Sec. II.A.1. In other words, this feature is simply the recitation of an idea with a direction to "do it" on a conventional computer, which is insufficient. That remains true even if correlation using conventional computers is faster than a human in reducing "false alarms," as SecureNet alleges. *See Univ. of Fla.*, 916 F.3d at 1367 ("While [the recited functions] may take longer using the manual method, a patent that automate[s] pen and paper methodologies to conserve human resources and minimize errors" is a "quintessential 'do it on a computer' patent").

#### 4. The *Senstar* Court Relied in Error on the Abstract Idea at Step Two

The *Senstar* court's deferment at *Alice* step two was the result of SecureNet persuading the court to rely, in error, on the abstract idea itself as containing inventive concepts. As demonstrated above, each concept that the *Senstar* court found to involve fact issues—hierarchical storage, weighting, attribute data, and correlating events—cannot supply an inventive concept because they are the abstract idea itself. The *Senstar* court's decision not to reach this conclusion was seemingly based on a misapprehension that the Federal Circuit's *Berkheimer* decision requires courts to make factual determinations at step two, regardless of whether the patents expose the alleged "inventive concepts" as abstract ideas. *See* 2020 WL 2557625, at *12. But "[t]he *Berkheimer* [] cases do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint

that the invention at issue is novel and that the inventive concept resides in the abstract idea itself." *First-Class Monitoring, LLC v. Ups of Am., Inc.*, 389 F. Supp. 3d 456, 471 (E.D. Tex. 2019).

To be clear, neither *Senstar* nor *Arrow* affirmatively found that any of those features were, in fact, inventive concepts. Rather, the *Senstar* court found that the question of whether these limitations were well-understood, routine, and conventional was a question of fact based on the limited record before it, while at the same time observing that the evidence suggested that defendant Senstar may have "the better side of the argument." *See* 2020 WL 2557625, at *12. The *Arrow* court similarly found that Arrow did not demonstrate otherwise or argue that the *Senstar* court was incorrect in finding possible fact issues. *See* 2023 WL 3821214, *11. Axis respectfully submits that had the *Senstar* court declined SecureNet's invitation to consider the abstract idea itself at step two in violation of Federal Circuit precedent, that court would have found the claims to lack any inventive concept that could transform their abstract nature, just like the Asserted Patent claims at issue here. *See BSG Tech*, 899 F.3d at 1290.

## V. CONCLUSION

For the foregoing reasons, Axis respectfully requests that the Court dismiss Plaintiff SecureNet's Second Amended Complaint (Dkt. 11) in its entirety with prejudice.

Dated: August 19, 2026

Respectfully submitted,

/s/ *J. Thad Heartfield*
J. Thad Heartfield
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, TX 77706
Tel: (409) 866-3318
thad@heartfieldlawfirm.com

Michael P. Sandonato (*pro hac vice* forthcoming)
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel.: (310) 229-9900
msandonato@venable.com

Jason M. Dorsky
Eric T. Harmon (*pro hac vice* forthcoming)
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
Tel: (202) 344-4000
jmdorsky@venable.com
etharmon@venable.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document and exhibits thereto were served upon counsel of record for Plaintiff on August 19, 2026, via ECF service.

/s/ *J. Thad Heartfield*
J. Thad Heartfield