**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| SECURENET SOLUTIONS GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AXIS COMMUNICATIONS AB,<br><br>Defendant. | C.A. No. 2:26-cv-00099-JRG<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Table of Contents

I. INTRODUCTION .......... 6
II. BACKGROUND .......... 8
III. LEGAL STANDARD .......... 11
IV. ARGUMENT .......... 12
A. Axis Has Not Established That Claim 48 Represents Every Asserted Claim. .......... 12
B. The Second Amended Complaint Pleads Concrete Technical Facts, and Whether Axis's Motion Should be Denied Does Not Depend Acceptance on the Helfers Declaration.. .......... 14
C. The Claims Are Directed to Improvements in Computerized Smart-Surveillance Systems, Not an Abstract Human Practice .......... 16
1. Axis Defines the Claims at an Impermissibly High Level. .......... 16
2. The Claimed Correlation Process Is Not Merely a Guard Connecting Dots. .......... 17
3. Sensor-Attribute Weighting Is Not Subjective Human Weighing. .......... 21
4. Sensory-Event-Based Hierarchical Storage Is Not Moving a Paper Logbook. .......... 22
5. Network-Status Monitoring Must Be Considered Within the Claimed Combination. .......... 23
6. Hardware Independence Does Not Negate a Software Improvement. .......... 23
D. The Claimed Enhanced Smart Surveillance System is Patent Eligible. .......... 24
E. The SAC Plausibly Alleges an Inventive Ordered Combination Under Step Two. .......... 25
1. Axis Cannot Define the Entire Claimed Architecture as the Abstract Idea and Then Exclude It at Step Two. .......... 28
2. The Specification Properly Illuminates Concrete Claim Limitations Already in the Claims. .......... 29
F. Senstar and Arrow Do Not Establish Eligibility, But They Confirm That Step Two Cannot Be Resolved as Axis Demands. .......... 32
G. Axis's Remaining Arguments Do Not Support Dismissal. .......... 32
1. Claim Construction and Disputed Claim Meaning Cannot Be Resolved Against SecureNet. .......... 32
2. Axis's Newer Authorities Do Not Permit Result-Only Treatment of These Claims.. .......... 33
V. CONCLUSION .......... 34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018)....8, 11, 12, 15

*ADASA Inc. v. Avery Dennison Corp.*
55 F.4th 900, 909-10 (Fed. Cir. 2022)....19

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014).... passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016)....12, 27

*BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016)....8, 11, 25, 28

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018).... passim

*BSG Tech LLC v. Buyseason, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)....28

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020)....27, 28, 29

*Contour IP Holding LLC v. GoPro, Inc.*,
113 F.4th 1373 (Fed. Cir. 2024)....19, 20

*Data Health Partners, Inc. v. Teladoc Health, Inc.*,
734 F. Supp. 3d 315 (D. Del. 2024)....19, 24

*Electric Power Group, LLC v. Alstom S.A.*
830 F.3d at 1353-54....19

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016).... passim

*Etison LLC v. Highlevel, Inc.*,
No. 2025-1711, 2026 U.S. App. LEXIS 19425 (Fed. Cir. July 2, 2026)....15

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)....20

*Fitbit, Inc. v. AliphCom.*
233 F. Supp. 3d 799 (N.D. Cal. 2017).....26

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026) ....................33

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ....................20

*In re Killian*,
45 F.4th 1373 (Fed. Cir. 2022) ....................20

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)....................20

*James v. Smith*,
152 F.4th 594 (5th Cir. 2025) ....................11, 14

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019)....................27

*Lone Star Fund V (US) LP v. Barclays Bank PLC*,
594 F.3d 383 (5th Cir. 2010) ....................11, 14

*Luminati Networks Ltd. v. Code200, UAB*,
No. 2:19-CV-00396-JRG, 2021 U.S. Dist. LEXIS 24742 (E.D. Tex. Feb. 9, 2021) ....................7, 11, 23, 29

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)....................12, 17

*Miller Mendel, Inc. v. City of Anna*,
107 F.4th 1345 (Fed. Cir. 2024) ....................20

*Mobile Acuity Ltd. v. Blippar Ltd.*,
110 F.4th 1280, 1290 (Fed. Cir. 2024) ....................12, 13, 14

*MyMail, Ltd. v. ooVoo, LLC*,
934 F.3d 1373 (Fed. Cir. 2019)....................33

*OnePass Data Tech. LLC v. Verizon Communications Inc.*,
No. 1:25-cv-01112-JCG, 2026 U.S. Dist. LEXIS 115367 (D. Del. May 26, 2026) ....................28

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)....................29

*Random Chat, LLC v. Altra Fed. Credit Union*,
No. 2:25-CV-00478-JRG, 2026 U.S. Dist. LEXIS 46242 (E.D. Tex. Mar. 6, 2026), *appeal filed*, No. 26-1626 (Fed. Cir. Apr. 7, 2026)....................20

*Repifi Vendor Logistics v. IntelliCentrics, Inc.*,
No. 21-1906, 2022 U.S. App. LEXIS 6558 (Fed. Cir. Mar. 15, 2022) ....................................33

*Samesurf, Inc. v. Intuit, Inc.*,
No. 3:22-CV-00412-RSH-DDL, 2023 U.S. Dist. LEXIS 37028 (S.D. Cal. Jan. 10, 2023) ....................................24

*SecureNet Sols. Group, LLC v. United States*,
No. 26-321 (Fed. Cl. July 14, 2026) ....................................6

*SecureNet Sols. Grp., LLC v. Arrow Elecs., Inc.*,
No. 22-cv-01254-KLM, 2023 U.S. Dist. LEXIS 97485 (D. Colo. June 5, 2023) ....................................6, 32

*SecureNet Sols. Grp., LLC v. Senstar Corp.*,
No. 19-cv-02913-NRN, 2020 U.S. Dist. LEXIS 88637 (D. Colo. May 20, 2020) ....................................6, 32

*Slyce Acquisition, Inc. v. Syte - Visual Conception, Ltd.*,
No. W-19-CV-00257-ADA, 2020 U.S. Dist. LEXIS 9451 (W.D. Tex. Jan. 10, 2020) ....................................6

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) *opinion modified on other grounds* 773 Fed. Appx. 620 (Fed. Cir. 2019) ....................................18

*TaKaDu Ltd. v. Innovyze, Inc.*,
No. 21-291-RGA, 2022 U.S. Dist. LEXIS 40614 (D. Del. Mar. 8, 2022) ....................................27

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020)....................................24

*Universal Secure Registry LLC v. Apple, Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ....................................33

*Visual Memory LLC v. NVIDIA Corp.*
867 F.3d 1253 (Fed. Cir. 2017)....................................22, 23, 24

**STATUTES**

35 U.S.C. § 282(a) ....................................11

35 USC § 101 ....................................6, 7, 11, 32, 33

# I. INTRODUCTION

Axis Communications AB's (Axis) Motion to Dismiss seeks to deem as ineligible nine related patents without addressing why claim construction is unnecessary or why a person of ordinary skill in the art would conclude that the claimed ordered combination of components and processes improving upon prior-art smart-surveillance systems is conventional as a matter of law. As numerous district courts have recognized, "because a patent is presumed valid and requires clear and convincing evidence to prove its invalidity, a Rule 12(b) motion to dismiss is a procedurally awkward place for a court to resolve a patent's § 101 eligibility," making it "wiser and more efficient" to determine eligibility after claim construction and the start of fact discovery. *Slyce Acquisition, Inc. v. Syte - Visual Conception, Ltd.*, No. W-19-CV-00257-ADA, 2020 U.S. Dist. LEXIS 9451, at *14-17 (W.D. Tex. Jan. 10, 2020). Indeed, three separate judges have denied or stayed similar motions for those reasons. *See SecureNet Sols. Grp., LLC v. Arrow Elecs., Inc.*, No. 22-cv-01254-KLM, 2023 U.S. Dist. LEXIS 97485 (D. Colo. June 5, 2023); *SecureNet Sols. Grp., LLC v. Senstar Corp.*, No. 19-cv-02913-NRN, 2020 U.S. Dist. LEXIS 88637 (D. Colo. May 20, 2020); *see also SecureNet Sols. Group, LLC v. United States*, No. 26-321 (Fed. Cl. July 14, 2026). [1] The Court should do the same here and deny Axis's motion.

On the merits, Axis relies on a familiar but improper § 101 shortcut: describe the claims from a distance, strip away the architecture, and declare the remainder abstract. *Alice*[2] does not permit that high-altitude analysis. The relevant baseline is the prior-art computerized smart-surveillance system, not a security guard with a pencil and logbook. Those prior art surveillance systems already collected, processed, stored, analyzed, and displayed sensor data. The claimed improvements here change how prior art systems process surveillance data. The claims recite a

[1] The order from the United States Court of Federal Claims is attached as Exhibit A.
[2] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

specific architecture that receives and normalizes heterogeneous sensor events, weights them using sensor-attribute data, evaluates historical correlations across time and space, continuously monitors for critical events, generates alerts based on those correlations, and, in certain claims, manages data through sensory-event-based hierarchical storage. The SAC alleges that these features address computer-specific problems: too many inputs arriving too quickly in incompatible formats, false alarms, missed detections, and storage overload. (Dkt. 11, ¶¶ 19-22, 23-48, 49-59, 64-68.)

Axis equates the claimed improvement to a security guard. But that security guard analogy removes the limitations that give the claims their technological character. Its guard supposedly writes standardized notes, recalls prior observations, considers whether a camera is reliable, moves old logbooks, checks whether cameras are connected, and sounds an alarm. But that analogy omits what the claims require. A guard does not normalize heterogeneous digital sensor events into a format usable by a correlation engine; automatically weight stored events standardized, machine-processable format; apply mathematical or probabilistic weights based on sensor attributes; create, store, and reuse compound and correlated-event records; evaluate historical relationships across time and space; or manage and cascade sensor data through multiple storage tiers based on sensory events. Axis cannot erase these limitations so that it can overgeneralize the functionality of the claimed invention. *See*, *e.g.*, *Luminati Networks Ltd. v. Code200, UAB*, No. 2:19-CV-00396-JRG, 2021 U.S. Dist. LEXIS 24742 (E.D. Tex. Feb. 9, 2021) (denying a motion to dismiss under § 101 where the defendant defined claims at too high a level of abstraction and its human-capability analogy failed to address specific limitations).

Even if Axis's oversimplification carried it through *Alice* step one, the motion would still fail at step two. The SAC plausibly alleges a nonconventional ordered combination of

components and processes that improves the smart-surveillance system itself. Axis points out that cameras, processors, databases, storage devices, and networks were known. That misses the point. Conventional components can supply an inventive concept when arranged in a nonconventional ordered combination that produces a technological improvement. *See*, *e.g.*, *BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Whether the claimed arrangement was well understood, routine, and conventional is a factual question, and the SAC's detailed allegations, including the ordered combination described in paragraph 68, cannot be rejected merely because Axis disputes them. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125, 1128 (Fed. Cir. 2018); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018). Indeed, where the claims and factual allegations identify a concrete technological arrangement, an inventive, ordered combination, or specific facts showing unconventionality, eligibility cannot be resolved on a motion to dismiss. Accordingly, Axis's motion to dismiss should be denied.

## II. BACKGROUND

In 2007, smart-surveillance systems had gained commercial adoption and begun replacing traditional security systems, turning surveillance into a large-scale data-analysis and data-management problem. (Dkt. 11 ¶¶ 16-19.) Existing systems could obtain data from distributed sensors but were not designed to process the volume, speed, and incompatible formats effectively. (*Id.*, ¶¶ 19-20, 33, 66.) The resulting flood of data produced false alarms, missed detections, and unreliable systems. (*Id.*, ¶¶ 19-22, 66.)

The asserted patents address those computer-specific problems through an ordered surveillance architecture. Figure 1 depicts data flowing from sensors and the system processes the data to detect primitive sensory events, normalizes the events into a standardized format, stores the events, evaluates historical correlations among stored events across time and space, monitors current events based on those correlations to identify critical events, and sends alerts, as shown in Figure 1.

Fig. 1




Certain claims further require weighting based on attribute data of the sensors or sensory data, monitoring network status, integrating legacy events, communicating among system modules over an IP network, or managing and cascading data through a hierarchy of storage devices based on sensory events. (*See, e.g.*, '616 patent cls. 39, 48; '314 patent cls. 1, 13, 21; '987 patent cl. 20; Dkt. 11 ¶¶ 20, 23-42, 54-70.)

The specification explains the software architecture in technological terms. Primitive events from heterogeneous sources are normalized and placed in an event queue for processing by a correlation engine; privacy and business filters limit what data proceeds; the system detects compound events, correlates primitive and compound events across time and space, creates correlated-event records, writes compound and correlated events back to an events database, evaluates rules against those enriched records, and uses the results to drive alerts or actions. (*See* '616 patent 4:4-49, 6:50-7:17, 7:53-10:33, FIG. 2; Dkt. 11 ¶¶ 23-32, 39-48.) The process is cumulative. Raw sensor information becomes structured primitive-event data; normalization permits heterogeneous events to be processed together; weighting adds information bearing on

the reliability or significance of those events; correlation adds information derived from relationships across time and space; and the resulting compound and correlated events are stored and used in later rule evaluation. The system therefore does not repeatedly analyze the same raw information. It creates progressively enriched event data and operates on that enriched data in subsequent machine analysis. (Dkt. 11 ¶¶ 40-42.)

Weighting also has a machine-defined role. Attribute data may reflect data quality, device age, maintenance history, integrity, reliability, power, bandwidth, latency, or other conditions affecting sensor output. (‘616 patent 4:50-5:10, 25:18-26:45; Dkt. 11 ¶¶ 33-38.) An administrator may configure parameters, but the system applies those parameters across sensors and events within its automated analysis. (Dkt. 11 ¶38.) Importantly, human customization does not transform the later machine operation into a mental process. (*Id.*)

The hierarchical storage manager addresses a separate computer-storage problem. Certain claims require the manager to access two or more data storage devices and manage storage and cascading through that hierarchy based at least on sensory events. (*See, e.g.*, ‘314 patent cl. 1; ‘744 patent cls. 25-26; ‘616 patent FIG. 4 (rotated).)




The asserted improvement lies in that logical storage process claimed to address the problem created by the sheer volume of sensor data. (‘616 patent 10:55 – 11:37.) The identification of conventional media therefore does not answer whether the claimed sensory-event-

based management and cascading was conventional in the ordered surveillance architecture. (Dkt. 11 ¶¶ 49-59, 68-70.)

## III. LEGAL STANDARD

The asserted patents are presumed valid. 35 U.S.C. § 282(a). Under 35 USC § 101, patent-eligible subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The Supreme Court has recognized three implicit exceptions to § 101, laws of nature, natural phenomena, and abstract ideas. *Alice*, 573 U.S. at 216 (internal quotation omitted).

Patent eligibility may be challenged by a Rule 12(b)(6) motion, as Axis has done here. *Aatrix*, 882 F.3d at 1125. Federal Circuit law governs substantive patent eligibility, while Fifth Circuit law governs the Rule 12(b)(6) standard. *See BASCOM*, 827 F.3d at 1347. In deciding a motion to dismiss, the Court may consider the complaint, documents attached to it, and documents attached to the motion that are central to the claims and referenced by the complaint. *Lone Star Fund V (US) LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must accept all well-pleaded facts as true and construe them in the light most favorable to SecureNet. *James v. Smith*, 152 F.4th 594, 608 (5th Cir. 2025). The Court need not accept "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (internal citation omitted).[3] Finally, "[i]n the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and rarely granted." *Luminati*, 2021 U.S. Dist. LEXIS 24742, at *5.

---

[3] In its opening brief, Axis does not argue that any *specific* allegations in the SAC are legal assertions or the mere recital of legal elements supported by only conclusory statements. (*See generally* Dkt. 17.) Thus, any forthcoming arguments by Axis about any specific allegations not being accepted as true should be treated as waived. *See Truesight Commc'ns LLC v. Lenovo Grp. Ltd.*, No. 2:24-CV-00031-JRG, 2024 U.S. Dist. LEXIS 225917, at *6 n.3 (E.D. Tex. Dec. 13, 2024) (noting that arguments raised for the first time in a reply brief may be treated as waived); *see also Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-cv-227, 2021 U.S. Dist. LEXIS 87342, at *9 n.1 (E.D. Tex. May 7, 2021) (noting that undeveloped arguments are deemed waived).

*Alice* requires a two-step framework. First, the Court determines whether the claims are directed to a patent-ineligible concept. *Alice*, 573 U.S. at 217. The inquiry must identify the claims' focus with specificity and consider them as a whole in light of the specification and the asserted improvement and a review of the claims in their entirety rather than distilling them to a supposed essence. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016). Describing claims at a high level of abstraction and untethered from their language risks allowing the exception to swallow the rule. *Enfish*, 822 F.3d at 1337. Because the Federal Circuit has not supplied a comprehensive definition of "abstract idea," courts also approach the inquiry in a common-law manner by comparing the claim's descriptive character with earlier cases involving similar subject matter. *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016).

Second, if a claim is directed to an abstract idea, the Court considers the elements individually and as an ordered combination to determine whether they supply an inventive concept. *Alice*, 573 U.S. at 217-18. Whether a claim element or ordered combination was well understood, routine, and conventional is a question of fact that must be proven by clear and convincing evidence. *Berkheimer*, 881 F.3d at 1368. Plausible and concrete allegations of unconventionality can preclude dismissal where the record does not refute them as a matter of law. *Aatrix*, 882 F.3d at 1125, 1128.

## IV. ARGUMENT

### A. Axis Has Not Established That Claim 48 Represents Every Asserted Claim.

Axis begins by selecting claim 48 of the '616 patent, which depends from claim 39, as representative of all fourteen asserted claims and every nonasserted claim in all nine patents. (Dkt. 17 at 16-22.) That is not the standard. Under *Mobile Acuity Ltd. v. Blippar Ltd.*, the patent

challenger bears the initial burden to make a prima facie showing that the claims grouped together are substantially similar and linked to the same ineligible concept. 110 F.4th 1280, 1290 (Fed. Cir. 2024). Only then does the burden shift to the patentee to identify the distinctive significance of limitations omitted from the proposed representative claim. *Berkheimer*, 881 F.3d at 1365. Axis cannot satisfy its initial burden by describing materially different claims at the same level of abstraction and declaring the differences irrelevant.

*Berkheimer* illustrates why those differences cannot be collapsed away. The district court there treated an independent claim as representative because it was the only asserted independent claim and received the bulk of the briefing. The Federal Circuit rejected that approach because dependent claims added meaningful limitations that could affect eligibility. 881 F.3d at 1365. Those dependent claims recited a particular archival technique that eliminated redundant storage through linked object structures, and the Federal Circuit separately analyzed whether that claimed storage improvement was unconventional. *Id.* at 1369-70. The same principle applies here: a claim lacking the HSM and sensory-event-based cascading limitations cannot serve as a representative claim. SecureNet has, in any event, identified nonfrivolous distinctions that matter to both *Alice* steps, such as the hierarchical storage manager (the "HSM") that manages storage and cascades sensor data through two or more storage devices based on sensory events. The HSM changes how the claimed system operates and the asserted technological improvement supplied by the ordered combination. (Dkt. 11 ¶¶ 49-70.) *See infra,* IV.C.4.

Axis's contrary argument is circular. It omits the HSM limitation from its representative claim, labels hierarchical storage conventional, and then concludes that the omitted limitation cannot affect eligibility. (Dkt. 17 at 18-21.) But whether sensory-event-based storage management changes the claim's focus at step one or contributes to an inventive ordered

combination at step two is the merits question. Claim 48 contains no hierarchical storage manager and no requirement that data be cascaded based on sensory events. Axis has not made the claim-by-claim or coherent claim-group showing required by *Mobile Acuity*, 110 F.4th at 1290. The Court should reject Axis's universal-representative theory and, at most, analyze only claim groups for which Axis has actually shown substantial similarity and addressed the material limitations. *See Berkheimer*, 881 F.3d at 1365.

**B. The Second Amended Complaint Pleads Concrete Technical Facts, and Whether Axis's Motion Should be Denied Does Not Depend Acceptance on the Helfers Declaration.**

Axis next asks the Court to generally disregard the SAC's eligibility allegations as conclusions and to exclude the attached Helfers declaration. (Dkt. 17 at 14-16.) But the SAC does not merely recite that the claims are eligible or unconventional. It alleges facts about the prior-art problem, identifies the claim-defined architecture, explains the factual operation of normalization, weighting, historical correlation, rule evaluation, alerting, and sensory-event-based hierarchical storage, and alleges why the ordered combination changed the operation of smart-surveillance systems. (Dkt. 11 ¶¶ 16-20, 23-48, 54-70.) Those are technical *factual* allegations, not labels, and they should be accepted as true at this stage. *James*, 152 F.4th at 608.

SecureNet does not contend that the words "eligible" or "inventive concept" must be accepted as facts. Nor does the motion turn on accepting Dr. Helfers's declaration, which supplies factual testimony based on twenty-five years of municipal-policing experience, including service as a security guard as well as experience as a Professor of Criminology at The University of Texas at Tyler. Even if the Court disregarded the declaration, which it need not do *see Lone Star*, 594 F.3d at 387, the SAC and patents independently describe the technological problem and claimed operation. Axis therefore attacks the wrong target. Its criticisms of Dr.

Helfers's qualifications, the patents he considered, and the citations in his declaration do not erase the SAC's separate allegations.

Axis also invokes *Etison LLC v. Highlevel, Inc.*, No. 2025-1711, 2026 U.S. App. LEXIS 19425, at *15 (Fed. Cir. July 2, 2026), for the proposition that conclusory eligibility allegations receive no weight. (Dkt. 17 at 15.) But *Etison* addresses conclusory allegations; it does not permit a court to disregard pleaded *facts* merely because they bear on eligibility. The SAC does not merely assert that the patents contain unconventional or non-routine inventive concepts. It identifies them. For example, paragraph 64 alleges: "At the time of the inventions in 2007, no commercially available smart surveillance system combined attribute-weighted correlation across time and space. . . . This probabilistic, machine-executed weighting is fundamentally different from any subjective assessment a human could perform and represents a non-conventional approach to data correlation that was anything but routine in computerized security systems in 2007." (Dkt. 11 ¶64.) The SAC also alleges that the ordered combination is nonconventional and non-generic and identifies its concrete benefits. (*Id.*, ¶¶ 65-70.). These facts are supported by Dr. Helfers' firsthand experience.

Allegations that claimed features were not well understood, routine, or conventional can preclude dismissal when not refuted as a matter of law. *See Aatrix*, 882 F.3d at 1125, 1128. Here, the SAC supplies the necessary specificity: it identifies the prior systems' deficiencies, the asserted sequence and relationships among modules and engines, machine weighting based on sensor attributes, creation and reuse of enriched event records, and sensory-event-based storage. (Dkt. 11 ¶¶ 19-20, 25-48, 54-70.) Paragraph 41 specifically describes the "computerized loop" from Figure 2: correlated and compound events are written back to the events database, so each

cycle operates on an enriched dataset and makes "an otherwise untraceable anomaly detectable." (*Id.*, ¶ 41.) Axis cannot ignore those factual allegations merely because it disputes them.

Axis's assertion that the common specification contradicts those allegations fares no better. Statements that the invention may run on different hardware architectures or use known physical media concern implementation flexibility; they do not establish as a matter of law that the claimed logical architecture and ordered process were routine and conventional. Hardware independence is not conventionality. Software can improve computer functionality without claiming a new physical computer or hardware architecture. *See Enfish*, 822 F.3d at 1335-36. At most, Axis raises a competing inference that cannot justify resolving the SAC's factual allegations against SecureNet.

### C. The Claims Are Directed to Improvements in Computerized Smart-Surveillance Systems, Not an Abstract Human Practice.

#### *1. Axis Defines the Claims at an Impermissibly High Level.*

At *Alice* step one, Axis describes the claims as correlating observable information, weighting its source based on subjective importance, storing it wherever desired, and providing an output. (Dkt. 17 at 6.) That description is not the claimed invention; it is a list of generic verbs left after Axis removes the limitations that give the claims their technological character.

The claims recite more. Claim 48, Axis's proposed representative, requires a processor-executed sequence that receives sensory and IP data; detects and normalizes primitive sensory events; stores and retrieves historical normalized events; automatically evaluates historical correlations across time or space; continuously monitors current sensory events based on those correlations to identify critical events; monitors network status to identify failures; sends alerts based on critical events or failures; and weights primitive sensory events based on sensor-attribute data. ('616 patent cls. 39, 48; Dkt. 11 ¶¶ 23-48, 60-70.) Other claims add legacy events,

specified sensor attributes, express module-to-module communication over an IP network, or sensory-event-based hierarchical storage. (Dkt. 11 ¶¶ 49-59, 68-70.)

Axis cannot omit these relationships and prevail by observing that humans can collect information, judge importance, remember facts, and communicate conclusions. If technology is reduced to its simplest function, it all involves processing, storing, and outputting information. *Enfish* rejects that mode of analysis. 822 F.3d at 1337 ("Moreover, our conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements."). *McRO*, 837 F.3d at 1312, rejects that method by requiring the claims to be considered in their entirety, and *Enfish*, 822 F.3d at 1337, rejects analysis untethered from the claimed technological improvement. The claim's focus must be determined from the claim as a whole, in light of the specification and the asserted advance, not from a defendant's generalized paraphrase.

Axis's analogies suffer from the same defect: they translate a claimed machine operation into a broader human activity and then ask whether a human can perform the translation. Normalization becomes "writing consistently"; correlation becomes "connecting dots"; weighting becomes "deciding what to trust"; and sensory-event-based storage cascading becomes "moving files." That translation replaces claim limitations with broad human activities and never addresses the actual claim limitations.

*2. The Claimed Correlation Process Is Not a Guard Connecting Dots.*

Axis's principal analogy maps claim limitations to a guard with a logbook. (Dkt. 17 at 22-27.) But the chart repeatedly substitutes a desired result for the machine operation, i.e., software, that produces it. Writing two entries in similar prose is not normalizing heterogeneous sensor events into a standardized format usable by the system. Consulting a prior entry is not

automatically evaluating historical correlations, i.e., statistical measurements, among stored and normalized events across time and space. Recognizing that two observations seem related is not creating compound and correlated event records, storing those records, applying rules against them, and using them in later cycles of computer analysis.

The shared specification describes a discrete sequence. Normalized events enter the correlation engine; privacy and business filters apply configured rules; compound-event detection identifies compound events; correlation modules correlate—i.e., statistically measure relationships among—primitive and compound events across space and time; the resulting records return to the events database; and rule evaluation operates on those enriched records to drive alerts or actions. (Dkt. 11 ¶¶ 25-32, 39-48; ‘616 patent 7:53-9:13.) The SAC alleges that each cycle can operate on prior compound and correlated events, enabling detection unavailable from isolated observations. (Dkt. 11 ¶¶ 39-42.) Axis's logbook analogy omits that logical architecture, which the claims recite. (*See*, *e.g.*, ’460 patent cl. 11; ’744 patent cls. 16, 26; ‘314 patent cls. 13, 21; ‘870 patent cl. 1; ‘342 patent cl. 17.) Nor are primitive events merely human observations given a technical name. A primitive event is an atomic, indivisible, machine-processable event data structure that can be stored and compared. Human-entered information may be digitized into such a structure, but the system—not the human—then normalizes, weights, correlates, stores, and evaluates it. The resulting correlated event is new information available for later analysis. (*See* ‘616 patent 4:4-5, 7:53-9:13; Dkt. 11, ¶¶ 24-32, 39-48.)

*SRI Int’l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) *opinion modified on other grounds* 773 Fed. Appx. 620 (Fed. Cir. 2019), likewise recognized that the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as the claims recited. Here, the claimed system similarly operates on normalized,

weighted event records across time and space. As *ADASA Inc. v. Avery Dennison Corp.* confirms, a hardware-based data structure directed to improving the technological process by which data are encoded is not an abstract idea merely because the underlying hardware is known. 55 F.4th 900, 909-10 (Fed. Cir. 2022).

*Electric Power Group, LLC v. Alstom S.A.* does not compel a different result. There, the asserted advance was collecting specified information, analyzing it, and displaying the result, without "any particular assertedly inventive technology for performing those functions." 830 F.3d at 1353-54. Nor did the claim specify a particular implementation for producing its composite indicator. Here, the baseline was different: smart-surveillance systems already collected, processed, analyzed, stored, and displayed sensor data. The claimed advance changes how those existing systems operate on that data. It requires the system to normalize heterogeneous events, weight them using sensor attributes, correlate them across time and space, create and store correlated-event records, and use enriched records to identify later critical events; certain claims add sensory-event-based cascading. SecureNet therefore claims an improvement to a computerized surveillance system—not mere collection and analysis or a faster human process. (Dkt. 11 ¶¶ 19-22, 39-48, 60-70; *see*, *e.g.*, '616 patent cls. 39, 48; '314 patent cls. 1, 13, 21.) *See also Data Health Partners, Inc. v. Teladoc Health, Inc.*, 734 F. Supp. 3d 315, 326 (D. Del. 2024).

The same distinction defeats the authorities Axis cites. Those decisions cannot be applied at the level of verbs alone. *See Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379-80 (Fed. Cir. 2024). None addresses the claimed combination of normalization, attribute-based weighting, and historical correlation, much less "correlation" as used in the patents: a statistical

measure expressing the extent to which variables are related.[4] Axis's cited cases involved materially different claims: *see, e.g.*, *Miller Mendel, Inc. v. City of Anna*, 107 F.4th 1345, 1352 (Fed. Cir. 2024) (background check); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir. 2023) (storing and displaying video); *In re Killian*, 45 F.4th 1373, 1379 (Fed. Cir. 2022) (search algorithm for identifying persons eligible for SSDI benefits); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (collecting and analyzing information to detect misuse and notifying a user); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (classifying and storing digital images); *Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 U.S. Dist. LEXIS 46242, at *7 (E.D. Tex. Mar. 6, 2026), *appeal filed*, No. 26-1626 (Fed. Cir. Apr. 7, 2026) (striking up a random conversation through online chat).

The Specification confirms the technical meaning of correlation by teaching that correlations are based on a value or other measure defining the relationship between two or more database-stored events, even when separated across space and time. (*See, e.g.*, '616 patent 7:4-6, 33:59-63.) The question is whether the claims, considered as a whole and in their technological context, are directed to generic information analysis or to an improvement in how networked-surveillance software structures, evaluates, and manages sensor events. The SAC plausibly alleges the latter: a technological means that provides technological improvements over prior art. (Dkt. 11 ¶¶ 19-22, 23-48, 60-70.) *See Contour*, 113 F.4th at 1379.

---

[4] JMP Statistical Discovery LLC, Statistics Knowledge Portal, Correlation, https://www.jmp.com/en/statistics-knowledge-portal/linear-models/what-is-correlation (last visited Sept. 1, 2026); *see also* National Institute of Standards and Technology, Engineering Statistics Handbook, Glossary, https://www.itl.nist.gov/div898/handbook/glossary.htm#C (last visited Sept. 1, 2026) ("Correlation is a measure of the strength of the (usually linear) relationship between two variables.")

### 3. *Sensor-Attribute Weighting Is Not Subjective Human Weighing.*

Axis next equates claimed weighting with a guard deciding how much to trust a camera. (Dkt. 17 at 10-11, 25-26.) The analogy conflates the source of a configurable parameter with the machine operation that applies it. An administrator or other person may select or enter an attribute, but that does not make the subsequent automated weighting and correlation a mental process. (Dkt. 11 ¶¶ 33-38.)

The claims connect weighting to sensor or sensory-data attributes. The specification identifies attributes such as data quality, device age, maintenance history, integrity, reliability, power, bandwidth, interference, weather, and camera type. (‘616 patent 4:50-5:10, 25:18-26:45; 31:22-54, 34:35-57.) The SAC specifically alleges that the system can detect bandwidth delay degrading image quality, reduce the weight assigned to events from that camera, and thereby avoid a false alert that a guard unaware of the bandwidth condition might trigger. (Dkt. 11 ¶37.) Administrator configuration does not convert the later computerized operation into a mental process. (*Id.*, ¶¶ 33-38.)

SecureNet does not ask the Court to import every disclosed equation or multidimensional vector into every claim. Those examples, however, illuminate the technical meaning of “weighting” and “attribute data.” The specification describes “weights, or weight functions” as probabilistic weights attached to data generated by sensory devices. (’616 patent 4:50-5:10, 25:18-26:45.) The claims require the operative relationship: sensor events are weighted based on attribute data and then used in the historical-correlation process. (*See*, *e.g.*, ‘314 patent cls. 1, 13; ‘040 patent cls. 1, 27; ‘984 patent cls. 1, 10.) “Weighing” information by subjective judgment is not the same as machine “weighting” event data through a mathematical or probabilistic construct. Axis’s credibility analogy ignores that relationship.

*4. Sensory-Event-Based Hierarchical Storage Is Not Moving a Paper Logbook.*

Axis also reduces the hierarchical storage manager to moving old logbooks from one cabinet to another. (Dkt. 17 at 11-12, 18-19, 26.) The analogy again omits the limitation and its context as set forth in the specification. Certain claims require an HSM with access to two or more storage devices that manages storage and cascades sensor data through the hierarchy based at least on sensory events. (*See*, *e.g.*, ‘314 patent cl. 1; ‘744 patent cls. 25-26; Dkt. 11 ¶¶ 49-59.)

That the underlying storage media may include conventional disks, tape, network-attached storage, or other known media does not resolve whether the claimed logical management and sensory-event-based cascading were conventional. The limitation is not a synonym for a human decision that a record is important: it ties cascading to sensory events generated by the surveillance system. (Dkt. 11, ¶¶ 49-59.) A software improvement need not invent a new disk any more than the plaintiff in *Enfish* needed to invent a new computer to have developed patentable software. 822 F.3d at 1339. The SAC alleges that the HSM addresses a surveillance-specific data-management problem by coordinating storage decisions with the event-processing architecture. (Dkt. 11 ¶¶ 49-59, 68-70.) Axis's paper analogy proves only that humans organize records. It does not show that a person performs the claimed computer-storage process or that the claimed process was conventional. The alleged improvement is not a new disk. It is how the claimed storage system operates: surveillance data are managed through storage tiers based on sensory events generated by the surveillance system itself.

*Visual Memory LLC v. NVIDIA Corp.*, makes the storage point concrete. 867 F.3d 1253 (Fed. Cir. 2017). The claimed memory system there used familiar components - main memory, cache, a bus, and a processor - and the district court treated those components as generic. *Id.*, at 1257. The Federal Circuit nevertheless reversed because the claims used a programmable operational characteristic to determine the type of data stored by the cache, allowing the memory

system to adapt its storage operation to different processors. *Id.* at 1259-60. The improvement was not a new memory chip; it was how existing memory components were configured to store data. The HSM claims allege the same kind of system-level improvement. The storage hierarchy is not a passive repository. Its manager uses sensory events generated by the surveillance system as an input to storage and cascading decisions, tying the operation of the storage hierarchy to what the surveillance system has detected. (*See* Dkt. 11 ¶¶ 54-59.) On the pleadings, that provides an asserted improvement in how a computerized storage system manages surveillance data, not merely the human idea of putting old records in a different cabinet.

*5. Network-Status Monitoring Must Be Considered Within the Claimed Combination.*

Axis portrays network-status monitoring as a guard noticing a black screen. (Dkt. 17 at 23.) But the relevant claims integrate IP data and real-time network monitoring with sensor-event processing, historical correlation, critical-event identification, and alerting. (*See*, *e.g.*, '616 patent cl. 39; '987 patent cl. 20.) The SAC alleges that the system monitors the health, status, and connectivity of components—including whether the HSM is full or nearing capacity—because a storage failure would prevent events from being stored and correlated. (Dkt. 11 ¶¶ 23-32, 39-48, 49-59; '616 patent 2:26-29, 4:12-15, 5:34-37, 6:43-48, 9:16-22.) Axis again isolates one limitation from the ordered surveillance process and substitutes a visual analog for the claimed computer functionality. Such analogizing is improper. *See Luminati*, 2021 U.S. Dist. LEXIS 24742, at *14.

*6. Hardware Independence Does Not Negate a Software Improvement.*

Axis repeatedly quotes statements that the invention may use any hardware architecture, different databases, different cameras, conventional storage media, and known networks. (*See* Dkt. 17 at 7-9, 28-31.) Those statements concern implementation flexibility, not whether the

claimed software relationships are abstract or conventional. The relevant distinction is between physical hardware and functional improvement. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) (discussing that software is patent-eligible in making improvements to the functionality of a computer or network). A claim may operate on multiple hardware configurations while still requiring a particular logical architecture. *See Enfish*, 822 F.3d at 1335.

Axis's reading would make hardware independence dispositive against software eligibility. *Enfish* forecloses that result: alleged improvements may reside in logical structures and processes rather than new physical components. *Id.* at 1335-36. The question is not whether new or specific processors and cameras existed but whether the claimed arrangement by which those components detect, normalize, store, weight, historically correlate, monitor, alert, and, in some claims, cascade surveillance events, improve smart-surveillance operation. The only reasonable inference from the factual allegations in the SAC and the asserted patents' claims and specification is that the claimed inventions do provide such a technological improvement.

**D. The Claimed Enhanced Smart Surveillance System is Patent Eligible.**

Despite Axis's arguments, the claimed enhanced smart-surveillance system is more like the patent-eligible subject matter in *Visual Memory.*, 867 F.3d at 1259-60 (finding claims patent eligible as directed to the technological improvement of an enhanced computer memory system) and *Enfish*, 822 F.3d at 1339 (finding claims patent eligible as directed to a specific implementation of a solution to a problem in the software arts) and *Data Health*, 734 F. Supp. 3d at 326 (finding claims patent eligible as directed to a statistical analysis to improve monitoring goal outcomes) and *Samesurf, Inc. v. Intuit, Inc.*, No. 3:22-CV-00412-RSH-DDL, 2023 U.S. Dist. LEXIS 37028, at *16-17 (S.D. Cal. Jan. 10, 2023) (finding claims patent eligible as directed to specific solution rooted in computer technology to overcome problem specifically "arising in the realm of computer networks—using a synchronization server to administer

synchronized browsing sessions to overcome bandwidth and processing issues of prior art”). Because the Asserted Claims are not directed to an abstract idea, the Court need not proceed to step two of *Alice* and Axis’s motion should be denied.

**E. The SAC Plausibly Alleges an Inventive Ordered Combination Under Step Two.**

Axis’s *Alice* step-two analysis repeats its step-one high-level generalization and dissection of the claims. It identifies each physical component as conventional, each operation as a familiar verb, and each output expected. (Dkt. 17 at 27-35.) But *Alice* requires the Court to consider the elements both individually and as an ordered combination. 573 U.S. at 217-18. A nonconventional and non-generic arrangement of known components can supply an inventive concept. *BASCOM*, 827 F.3d at 1350.

The alleged inventive concept is not a camera, processor, database, or storage medium standing alone. Nor is it the bare word “correlation” or “weighting.” It is the claimed arrangement in which the surveillance system receives and structures sensory events, stores them for retrieval, weights events based on sensor attributes, evaluates historical correlations across time and space, continuously monitors current events based on those correlations, identifies critical events, generates alerts, and, in certain claims, manages and cascades sensor data through storage tiers based on sensory events. The SAC alleges that this ordered combination addressed false alarms, missed detections, incompatible input formats, and surveillance-data overload in a way prior systems did not. (Dkt. 11 ¶¶ 19-20, 54-70.) And the claimed, ordered combination is not merely doing processes faster, but it is a technological improvement on smart-surveillance systems by reducing or lowering false alarms, filtering out unnecessary information, reducing storage complexity and costs, and enhancing search and retrieval capabilities. (*See* ‘616 patent, 2:9-13, 8:26-28, 11:25-26, 14:39-41, 30:50-52.)

Axis points to specification passages describing general-purpose hardware and known media. (Dkt. 17 at 28-31.) Those passages may show that individual physical components were known. They do not address, let alone establish by clear and convincing evidence, that the claimed arrangement and operation were well understood, routine, and conventional. *See Berkheimer*, 881 F.3d at 1369 ("improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities"). Axis's disagreement with the SAC and its inference taken from hardware flexibility do not resolve the facts against SecureNet or establish conventionality by clear and convincing evidence.

*Fitbit, Inc. v. AliphCom*, underscores why Axis cannot end the step-two inquiry by labeling each physical component generic. 233 F. Supp. 3d 799 (N.D. Cal. 2017). There, the court agreed that the server, client, and portable device were individually conventional, but still found an inventive concept in the claimed use of the server as a third participant in the pairing process. *Id.* at 812. The server changed the operation of the conventional two-device pairing paradigm by automatically regulating which devices were eligible to pair and supplying information the user otherwise would have had to provide. *See id.* at 812-13. The same ordered-combination principle applies here. The question is not whether a storage device, database, processor, or network was known in isolation, but whether the claimed roles and interactions—including sensory-event-based cascading, sensor-attribute weighting, and correlation using enriched event records—were conventional in a smart-surveillance system. The SAC plausibly alleges they were not. (Dkt. 11 ¶¶ 60-70.)

Axis's "expected results" argument likewise presents, at most, a factual dispute. (Dkt. 17 at 29-30.) The SAC alleges that prior systems could not effectively process heterogeneous

surveillance inputs to produce the claimed weighted historical correlations and enriched event records, and that the claimed combination enabled different system capabilities. (Dkt. 11 ¶¶ 19-20, 31-48, 60-70.) Whether those results were expected from the claimed arrangement—i.e., routine—cannot be established merely by showing that the general hardware used for the process existed. *See Berkheimer*, 881 F.3d at 1368, 1370 ("question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" and thus, summary judgment on patent eligibility was inappropriate).

The creation and reuse of enriched event data also supports an inventive concept. The system does not repeatedly analyze unchanged inputs; it normalizes and weights sensor events, correlates them across time and space, stores the resulting records, and uses those enriched records in later analysis. (Dkt. 11 ¶¶ 39-48, 65-66.) *Amdocs* found an inventive concept where correlation enhanced existing network records, and *KPN* rejected characterizing a claimed transformation that improved error detection as mere data manipulation. *Amdocs*, 841 F.3d at 1300-01; *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150-52 (Fed. Cir. 2019). *TaKaDu* is especially instructive: individually insignificant sensor anomalies became meaningful when retrieved from stored event data and combined under rules to identify a previously untraceable composite anomaly. *TaKaDu Ltd. v. Innovyze, Inc.*, No. 21-291-RGA, 2022 U.S. Dist. LEXIS 40614, at *12-14 (D. Del. Mar. 8, 2022). *CardioNet* is analogous: its sensor-monitoring system reduced false positives by weighting detected ventricular beats, and the Federal Circuit held the claims directed to an improved monitoring device, not an abstract idea. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368-71 (Fed. Cir. 2020). Thus, *TaKaDu* confirms the significance of combining individually insignificant sensor events, while

*CardioNet* confirms that weighting can be part of a technological monitoring improvement. SecureNet's claims similarly use sensor attributes to weight events, then correlate and enrich them to reveal anomalies not apparent from isolated inputs. (Dkt. 11, ¶¶ 37-42, 64-66.) The district court's decision in *OnePass* confirms the same step-two point: an ordered data-processing method can supply an inventive concept even when the underlying computer components are conventional. *OnePass Data Tech. LLC v. Verizon Communications Inc.*, No. 1:25-cv-01112-JCG, 2026 U.S. Dist. LEXIS 115367, at *24-27 (D. Del. May 26, 2026).

1. *Axis Cannot Define the Entire Claimed Architecture as the Abstract Idea and Then Exclude It at Step Two.*

Axis relies on *BSG Tech LLC v. Buyseason, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018), to argue that correlation, weighting, attribute data, and hierarchical storage cannot supply an inventive concept because they are each part of the abstract idea from step one. (Dkt. 17 at 32-34.) But that argument depends on accepting Axis's overbroad and dismembered step-one formulation. Axis cannot define the abstract idea to consume the entire claimed architecture and then use that definition to avoid an ordered-combination analysis. Even in *BSG*, the patentee claimed only one unconventional feature, leaving no need to examine other features alone or in combination. 899 F.3d at 1291 ("BSG Tech does not argue that other, non-abstract features of the claimed inventions, alone or in combination, are not well-understood, routine and conventional database structures and activities.").

SecureNet does not contend that the bare ideas of comparing information, assigning importance, or organizing records are inventive. The asserted inventive concepts are the claim-defined technical arrangement and the interaction of its components. (*See* Dkt. 11 ¶¶ 60-70.) *BASCOM* is particularly instructive as there customization was part of the technological improvement: the claimed architecture permitted filtering to be tailored to individual users rather

than applying the same criteria to everyone. 827 F.3d at 1350-52. The claimed architecture here similarly improves smart surveillance by allowing the system to account for the facility and its particular sensors rather than treating every surveillance environment the same. That customization affects the data on which the system operates; the system then applies objective criteria, including sensor attributes, weights, and historical correlations, to determine whether events are anomalous. The result is not subjective decision-making. Customization improves the fit of the surveillance system to its environment, while weighting and correlation enrich the event data used for the system's subsequent objective analysis.

Here, the SAC alleges a particular arrangement of sensor-event detection, normalization, structured storage, attribute-based weighting, historical correlation, continuous monitoring, correlation-based critical-event identification, alerting, and, in some claims, sensory-event-based storage cascading. Axis fails to address that combination and therefore cannot satisfy its clear-and-convincing-evidence burden at step two. (Dkt. 11 ¶¶ 60-70, especially ¶68.)

2. *The Specification Properly Illuminates Concrete Claim Limitations Already in the Claims.*

Axis argues that SecureNet improperly relies on nonlimiting embodiments, equations, database tables, and disclosed examples. (Dkt. 17 at 31-32.) SecureNet does not ask the Court to import every disclosed detail into every claim. The claim language controls, but it is not read in a vacuum. Claim terms are read in view of the specification, which is the single best guide to their meaning and the technological context of the claimed advance. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368-69 (Fed. Cir. 2020); *Enfish*, 822 F.3d at 1335-36; *see also Luminati*, 2021 U.S. Dist. LEXIS 24742, at *11-13.

That distinction matters here. SecureNet is not supplying limitations missing from the claims; the operative limitations are already recited. The SAC alleges that data is processed to detect primitive sensory events; normalization into a standardized data format; storage and retrieval of events; attribute-based weighting; historical correlation across time or space; continuous monitoring; critical-event identification; alerting; and, in certain claims, sensory-event-based hierarchical storage. The specification explains what those claimed operations mean in the disclosed smart-surveillance system. Axis cannot rely on the specification to call the hardware conventional while refusing to consult the same intrinsic record to understand the claimed software operations and their asserted improvement.

The first claimed operation illustrates the problem with Axis's abstraction. The claims require a primitive-event analytics module that receives sensory data about a physical environment from one or more sensors, processes that sensory data, and detects primitive sensory events. (*See*, *e.g.*, '460 patent cl. 1; '616 patent cl. 39.) The specification explains that primitive events include motion detected, a gunshot detected, a person detected, object speed, a camera losing connection, and a stolen plate detected, and that such events may be generated by sensory devices, analytics devices, or analytics software. ('616 patent 4:4-16.) In camera implementations, the specification identifies IP cameras and video analytics as sources of sensory data and detected events. (*Id.* 4:4-16, 24:40-25:17; Table 4.) Those disclosures do not add an IP-camera limitation to every claim. They give technological meaning to the claimed sensor, sensory-data, detection, and primitive-event limitations. Where asserted claims expressly require detecting a face, vehicle, license plate, object size, or speed, those image-analysis limitations are part of the claim and cannot be omitted from the eligibility analysis.

The same is true downstream. "Normalization" cannot be replaced with neat note-taking when the claim requires transformation into a standardized data format. "Weighting" cannot be reduced to a guard deciding which camera looks better when the specification describes weights or weight functions attached to sensor-generated data and used by the correlation engine. And "historical correlations" cannot be reduced to human memory when the claim requires automatic analysis of stored events across time or space and uses those correlations in later continuous monitoring. Axis's analogy works only after those claim terms are stripped of the meaning supplied by the intrinsic record.

A closer look at one of the claimed technologies shows the concrete and limited nature of the system. The claimed correlation process or system implements an enhanced smart surveillance system through a specific, discrete sequence: (a) continuous monitoring; (b) in real-time; (c) of the stored events; (d) across at least one of time and space; (e) to identify a critical event; and (f) where the critical event is based on one or more historical correlations among the stored sensory events. (Dkt. 11 ¶65; *see, e.g.*, '616 patent, cl. 39.) Events are not the same as the raw data coming from the sensors. (*See* '616 patent, 8:6-11 (explaining the recording of video data vs. recording primitive events); 13:8-17 (explaining storing video data with no primitive events and video data with primitive events).) Indeed, the specification explains the various events. (*See* '616 patent, 4:4-5 ("a 'primitive event' is an atomic, indivisible events from any subsystem"). And for the correlation engine or module to be able to identify a critical event, it must be based one or more historical correlations. (*See* '616 patent cl. 39; '314 patent, cl. 1.) This is all done in furtherance of a core purpose of the patented invention: lowering false alarms and filtering unwanted or distracting information. ('616 patent, 2:11-13.) Thus, by following the unconventional, claimed correlation process, smart surveillance systems could better wade

through the vast amounts of data and make meaningful distinctions in an effort to reduce false alarms and missed detections. (*See* Dkt. 11 ¶¶ 19-21.)

**F. Senstar and Arrow Do Not Establish Eligibility, But They Confirm That Step Two Cannot Be Resolved as Axis Demands.**

Axis criticizes the district court's decision in *Senstar*, arguing that the court improperly relied on aspects of the abstract idea at step two. (Dkt. 17 at 34-35.) SecureNet need not overstate the decisions in *Senstar* or *Arrow*. Neither decision held that every asserted claim is conclusively eligible. Their significance is narrower: courts considering related claims and the same specification declined to enter judgment of ineligibility at step two because the relevant factual issues were not eliminated on the pleading record. *Senstar Corp.*, 2020 U.S. Dist. LEXIS 88637, at *32-35; *Arrow Elecs., Inc.*, 2023 U.S. Dist. LEXIS 97485, at *22-27.

Axis's disagreement with *Senstar* does not erase the factual allegations here. The SAC pleads the technical basis for unconventionality in greater detail, including the claimed sequence, the operation of the correlation engine, the role of sensor-attribute weighting, the creation and reuse of enriched events, and the integration of event-based storage management. (Dkt. 11 ¶¶ 16-70, especially ¶¶ 39-42, 64-68.) At minimum, the decisions in *Senstar* and *Arrow* refute Axis's suggestion that the common specification itself conclusively establishes ineligibility as a matter of law.

**G. Axis's Remaining Arguments Do Not Support Dismissal.**

1. *Claim Construction and Disputed Claim Meaning Cannot Be Resolved Against SecureNet.*

In conclusory fashion, Axis asserts that no claim construction is necessary. (Dkt. 17 at 14-15.) But its motion depends on disputed meanings of terms and phrases that drive its § 101 theory, including "primitive sensory event," "normalize ... into a standardized data format," "processing the sensory data ... to detect," "attribute data," "weighted based ... on attribute data,"

"historical correlations," and "cascade data ... based on at least the sensory events." Axis repeatedly substitutes broader human concepts for those claim terms. That is a claim-meaning dispute, not a neutral application of *Alice*. (Dkt. 11 ¶¶ 24-42, 49-59.)

Those disputes affect eligibility. Axis treats a primitive sensory event as an observation, normalization as consistent note-taking, weighting as a subjective credibility judgment, historical correlation as memory, and sensory-event-based cascading as moving a record. SecureNet's proposed constructions are grounded in the claim language and the common specification's description of the claimed surveillance architecture. The Court may not simply adopt Axis's paraphrases while drawing the resulting inferences against SecureNet. The Court "must either adopt the [patentee's] constructions or resolve the dispute to whatever extent is needed to conduct the § 101 analysis." *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019). The motion should therefore be denied or deferred if the Court does not adopt SecureNet's constructions for purposes of this motion.

2. *Axis's Newer Authorities Do Not Permit Result-Only Treatment of These Claims.*

Axis relies on various additional authorities to support its step-two arguments. *See, e.g.*, *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053 (Fed. Cir. 2026); *Repifi Vendor Logistics v. IntelliCentrics, Inc.*, No. 21-1906, 2022 U.S. App. LEXIS 6558 (Fed. Cir. Mar. 15, 2022); and *Universal Secure Registry LLC v. Apple, Inc.*, 10 F.4th 1342 (Fed. Cir. 2021). None of those decisions alters the governing requirement to analyze the actual claim language in light of the specification, the asserted improvements, and the ordered combination. SecureNet agrees that a result-focused claim does not become eligible merely by invoking computers and that legal conclusions do not defeat dismissal. But the SAC alleges, and the patents show, much more: a processor-executed sequence and interacting modules that structure sensor events, apply

attribute-based weighting, evaluate historical correlations, monitor for correlation-based critical events, and generate alerts, with additional claim groups adding legacy-event integration and sensory-event-based hierarchical storage. (Dkt. 11 ¶¶ 23-59, 60-70.)

Axis argues that the claims merely state desired outcomes. SecureNet alleges, however, how the improved surveillance functions are achieved through the recited sequence and relationships. That dispute must be resolved from the claims as a whole, with reasonable inferences drawn in SecureNet's favor; under that analysis, Axis fails to carry its burden. Moreover, although the SAC alleges that the claimed invention was not well understood, routine, or conventional, Axis offers no facts establishing by clear and convincing evidence that each asserted claim element and claimed combination applies an abstract idea using conventional and well-understood techniques. Because Axis fails to satisfy its burden, its motion must be denied. (Dkt. 11 ¶¶ 39-48, 60-70.)

## V. CONCLUSION

For these reasons, SecureNet respectfully requests that the Court deny Axis's motion to dismiss. Alternatively, the Court should deny the motion without prejudice to a developed factual record and any necessary claim construction.

Dated: September 2, 2026

By: /s/ Albert Bianchi, Jr.
Jon R. Trembath
State Bar of Texas # 20207920
Vandana Koelsch, *pro hac vice*
675 15th St., Ste 2000
Denver, CO 80202-4251
Tel.720.240.9515
Fax 877.398.5240
jrtrembath@michaelbest.com
vandana.koelsch@michaelbest.com

Albert Bianchi, Jr., *pro hac vice*
1 S. Pinckney Street, Suite 700
Madison, WI 53703
Tel.608.257.3501
Fax: 608.283.2276
aj.bianchi@michaelbest.com

*Counsel for Plaintiff*
*SecureNet Solutions Group, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a).

*/s/ Albert Bianchi, Jr.*